## In re Michael Lewis's Will.

*December 23, 1880 — January 11, 1881.*

WILLS: *their execution and proof.*

1. Upon all the evidence in this case (for which see the opinion), this court holds (contrary to the findings of the circuit court), that the decedent possessed testamentary capacity at the time the alleged will was executed and attested; and that the instrument had been executed by him *before* the attesting witnesses affixed their signatures as such.
2. Whether it is essential to the validity of a will that the testator affix his signature before the attesting witnesses affix theirs, is not here considered.

APPEAL from the Circuit Court for *Manitowoc* County.

On the 14th day of March, 1879, in the county of Manitowoc, Michael Lewis died, leaving an instrument, executed by him two days before his death, purporting to be his last will and testament. The instrument and the attestation thereof are as follows:

"I, Michael Lewis, of Lockport, state of New York, being sound of mind and memory, do hereby make, publish, and declare to be my last will and testament, thereby revoking and making void all former wills by me at any time made heretofore. *First*, I order and direct my executors, as soon as practicable after my decease, to pay off and discharge all the debts, dues and liabilities that may exist against me at the time of my decease; *second*, I will and bequeath to my brother, John Lewis, Ransomville, Niagara county, New York state, one dollor ($1); *third*, I will and bequeath to my second cousin, Dennis Lewis, Miltown Castle, county Cork, Ireland, whatever property or moneys I may be possessed of at the time of my death.

"I hereby nominate and appoint as my executors, James Peppard, Meeme, Manitowoc county, Wisconsin, and Patrick Burnes, Meeme, Manitowoc county, Wisconsin.

"In witness thereof I have hereunto subscribed my name,

"MICHAEL LEWIS.

"*This twelfth day of March, 1879, A. D.*

In re Michael Lewis's Will.

"The above and foregoing instrument was, at the date thereof, signed, sealed and published and declared by the said Michael Lewis for his last will and testament, in presence of us, who, at his request and in his presence, and in presence of each other, have subscribed our names as witnesses.

"JAMES PEPPARD,
"PATRICK BURNES."

The instrument was offered for probate to the county court by the attesting witness Peppard, and probate thereof was contested by *John Lewis*, the brother, and probably the only heir-at-law of the deceased. The county court admitted the instrument to probate as the last will and testament of the deceased. Both of the persons named therein as executors having declined to act as such, the court appointed *Charles Luling* administrator with the will annexed of the estate of the deceased. The contestant, *John Lewis*, thereupon appealed to the circuit court from the order of the county court admitting the instrument to probate and establishing it as a valid will. A hearing of the matter was had in the circuit court, which resulted in an order or judgment reversing the decision of the county court, and directing that court to refuse probate of the instrument.

The findings of fact filed by the circuit court were as follows:

"*First.* That the instrument propounded as the last will and testament of said deceased, particularly described in the order appealed from, was signed and attested by the witnesses, Patrick Burnes and James Peppard, the subscribing witnesses thereto, prior to the signing of the same by the testator, Michael Lewis. *Second.* That said witnesses signed said paper, propounded as said will, in the presence of the testator, and the witnesses and the testator remained together from the time of signing said paper by said witnesses until after the same was signed by the testator. *Third.* That, at the time of the attesting and subscribing of said paper by said witnesses,

the said testator was not conscious so as to be able to understand and comprehend the acts of said witnesses, and that they were attesting and subscribing his will."

The conclusions of law were: *First.* "That the said paper propounded as such last will and testament was not attested and subscribed by Patrick Burnes and James Peppard as subscribing witnesses as required by law." *Second.* "That said paper, propounded as such last will and testament, was not attested and subscribed by any witnesses in the conscious presence of Michael Lewis, the alleged testator."

The testimony on the hearing is sufficiently stated in the opinion. This appeal was taken by the administrator from the order or judgment of the circuit court.

For the appellant there was a brief by *Nash & Schmitz*, and oral argument by *Mr. Nash*. To the point that the particular order of the several requisites to the valid execution of a will is not material, provided they be done at the same time and as parts of the same transaction, they cited *O'Brien v. Galagher*, 25 Conn., 229; *Miller v. McNeill*, 35 Pa. St., 217; *Swift v. Wiley*, 1 B. Mon., 114; *Vaughan v. Burford*, 3 Bradf. Surr., 78; *Sechrest v. Edwards*, 4 Met. (Ky.), 163; *Rieben v. Hicks*, 3 Bradf. Surr., 355; *Vaughan v. Vaughan*, 4 Am. Law Reg. (N. S.), 735; *Downie's Will*, 42 Wis., 66; 1 Redf. on Wills (4th ed.), 227, 243.

For the respondent, there was a brief by *H. G. & W. J. Turner*, and oral argument by *W. J. Turner* and *Wm. F. Vilas*. They argued, among other things, that the will should have been attested and subscribed by the witnesses after being signed by the testator, citing *Chase v. Kittredge*, 11 Allen, 49; *Dewey v. Dewey*, 1 Met., 352; 1 Redf. on Wills, 240, 243; 1 Kent's Comm. (12th ed.), 516, n. 1; 1 Williams on Ex'rs (Perkins' ed.), 90; *Moore v. King*, 3 Curteis, 243; *Cooper v. Bockett*, id., 648; *In the Goods of Allen*, 2 id., 331; *Hindmarsh v. Charlton*, 8 H. L. Cas., 160; *In the Goods of Maddock*, 10 Eng. (Moak), 523; *In the Goods of*

*Dilkes*, id., 519; *Phipps v. Hale*, id., 521; *Pearson v. Pearson*, 4 id., 677; *Fischer v. Popham*, 13 id., 469; *Re Olding*, 2 Curteis, 865; *Re Byrd*, 3 id., 117; *Charlton v. Hindmarsh*, 1 Swab. & Tr., 433; *Re Cunningham*, 29 L. J., N. S. (Prob.), 71; *Re Hoskins*, 32 id., 158; *Boldry v. Parris*, 2 Cush., 433; *Jackson v. Jackson*, 39 N. Y., 153; *Sisters of Charity v. Kelly*, 67 id., 409; *Rugg v. Rugg*, 21 Hun, 383; *Duffie v. Corridon*, 40 Ga., 122; *Reed v. Watson*, 27 Ind., 443; *Bundy v. McKight*, 48 id., 502.

LYON, J. The judgment of the circuit court rests upon two propositions of fact found by the court. These are — *first*, that the witnesses to the instrument propounded as the last will of Michael Lewis affixed their signatures thereto before it was signed by Lewis; and *second*, that when the instrument was so signed by the witnesses, the alleged testator was unable to understand and comprehend what they were doing; that is to say (as we understand the finding), that he had not at that time sound disposing mind and memory.

1. The question of testamentary capacity will first be considered; and for that purpose we shall consider the findings of the circuit court as equivalent to a finding that the deceased had not testamentary capacity when he executed the instrument in question.

The test of testamentary capacity as stated by Judge DAVIES in *Delafield v. Parish*, 25 N. Y., 9, has been approved by this court in *Holden v. Meadows*, 31 Wis., 284; *Burnham v. Mitchell*, 34 Wis., 117; *In re Will of Susan Jenkins*, 43 Wis., 610; *In re Will of Blakely*, 48 Wis., 294. See, also, *In re Chafin's Will*, 32 Wis., 558. Judge DAVIES says: "It is essential that the testator has sufficient capacity to comprehend perfectly the condition of his property, his relations to the persons who were or should or might have been the objects of his bounty, and the scope and bearing of the provisions of his will. He must, in the language of the cases,

have sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and be able to form some rational judgment in relation to them." This is the test by which the question of the capacity of the alleged testator to make a valid will must be determined. We come now to consider the testimony.

It appears that Michael Lewis was a bachelor, and was probably about sixty years of age when he died. He was born in Ireland, but had been in this country more than twenty years. About twenty years ago he came to Wisconsin from the state of New York, where his brother, the contestant, resided and still resides, and purchased forty acres of land in Manitowoc county. He made some improvements upon this land, and owned it at the time of his death. He traveled about the country considerably, stopping in Wisconsin but a small part of the time. He was a close, prudent man, not liberal with his money, and at the time of his death had, besides his land, between $2,000 and $3,000 in notes against various parties. He was a laboring man, with but little education, but possessed a fair degree of intelligence for one of his class.

Early in January, 1879, after an absence of several years, he returned to Manitowoc county for the avowed purpose of selling his land. He also expressed an intention to return to his native country. From the time he so returned until about two weeks before he died, he lodged at the house of one Patrick Burnes. He then went to the hotel of one Michael Herr, a few miles distant, where he remained until he died. When he came to Burnes' he was suffering from a severe cold, and his health remained impaired to the time of his death.

During the afternoon of March 11, while in conversation with some person relative to a sale of his land, he was suddenly seized with a fit and became unconscious. His malady was probably epilepsy. His consciousness soon returned,

however, and in the evening Burnes, who had been sent for, conversed with him about making a will and sending for a priest. The deceased consented that a priest be sent for the next morning, and (as Burnes testifies) expressed an intention to devise his land to Burnes. The next morning Burnes brought to him the Rev. Father Butler, a priest of his church. The deceased was about the house, and was apparently suffering from some injury to his mouth or tongue, received during his fit of the day before. Father Butler administered to him the rites of the church in the parlor of Herr's hotel, and the deceased then went to the dining room and drank a cup of tea. He returned to the parlor, and the instrument in question was drawn up and signed. The circumstances of those transactions and the mental condition of the deceased are so well stated by Mr. Butler, that we can do no better than to quote somewhat at length from his testimony. He states that soon after he performed his priestly functions, deceased retired to the next room for breakfast, and afterwards returned to the parlor. The witness then proceeds as follows: "On his return I spoke to him about the advisability of settling his temporal affairs. I first ascertained about the amount of property he was possessed of, and, after finding out the amount, I told him it would be desirable to make his will, and, in the absence of a more competent person, that I would draw it up for him. The only item of any importance in the will about his temporal affairs was in regard to the amount of moneys and property, of which he informed me, with the exception of some small amounts. He showed me his notes: one for $1,800 — as near as I can think, that was the note,— and another note for a smaller amount, on some party in New York; and a farm that he wished to dispose of — about forty acres. Then I wished to know how he wished to dispose of his property. He said that he wished all of his property, and all that would be found, all that he was possessed of, to go to Dennis Lewis, of Milton, Charleville, county Cork, Ireland. He told me that Dennis

Lewis was a second cousin of his. I asked him if he had any relatives in America, and he informed me that he had a brother, *John Lewis*, near New York. I asked him what was the reason he passed him by in his will — forgot him in his will. The reason he asserted was, that he did not act like a brother and friend towards him, and when he possessed more property or money than at present, that he offered it to his brother *John* to keep him in his house, and the brother refused doing so. I then told him I did not think he was acting fairly with him, being possessed of so much property. He said then he would leave him one dollar. I remonstrated considerably with him, but to no effect. I then advised him to leave some bequest for charitable purposes. He then said he had done considerable for his church in the way of bequests. He then promised he would do something when he would sell his farm. I don't remember of anything of importance that transpired between us after that. I think previous to that he called in Mr. Herr to get the change of four dollars. The object was to pay me something for my trouble, as he termed it. I told him he need not be troubled about anything in that way; that we never received anything for visiting the sick and tending the dying. I said considerable to him about his bodily health previous to the making of the will, and told him his health was bad; that the state of his health was physically bad. I told him that the will required to be signed, and I called in the witnesses — Mr. Peppard and Patrick Burnes. Previous, when he was disposing of all his property to his cousin, Dennis Lewis, I advised him to leave something for charitable purposes. He declined doing anything at that time, saying that he would see me when he succeeded in selling his farm; that he would see me then about charitable purposes. He could not be persuaded he was dangerously ill. The witnesses were called in, and signed the will in presence of the testator and in presence of each other. The witnesses advised him also to leave something

for charitable purposes. He didn't say anything in their presence. After a little conversation they had with him, he fell into a severe epileptic fit — fell to the ground. He was cared for in the best manner we possibly could. I advised him, in the first place, to send for the doctor, when I first entered, or shortly after, when I found the state of his health. I advised him to send for a doctor, and he declined. I thought I could succeed with him, but found I could not. He made some expression, which I cannot now remember, as to why he would not send for a doctor. I knew a doctor could not help him much, and so did not urge him. I told him if he would not do it for his own sake, he ought to do it for the sake of the family in whose house he was boarding. He said, in reply, he. wanted no doctor. Mr. Lewis showed me the money he had, and took out a ten-dollar bill and a four-dollar, Canada money, I expect. Then Mr. Lewis found he had a two-dollar bill, and said that would be sufficient for the present. In the conversation which preceded the will, he said that this second cousin, Dennis Lewis, was always kind to him. I had no religious communication with him aside from the confessional, which I always keep secret. I called on Mr. Peppard and Mr. Burnes to come in as witnesses because they were sitting there in Mr. Herr's bar-room. The parlor was inside the bar-room. I drew the will up before Mr. Peppard and Mr. Burnes were called in. They are named as executors in the will because Mr. Lewis knew they were outside, and he wished them named as executors of the will. When I advised him to make his will, he consented; said, I suppose, 'Proceed with it,' or something equivalent to that. I don't know the exact words, but he consented. . . . I think I have told now, substantially, all of the conversation had between me and Michael Lewis at that time. *Question.* In all this conversation, did you observe any incoherence in language or ideas on the part of Michael Lewis? *Answer.* I did not. Shortly before this fit, I noticed him kind of stupid like. It was after the signing of the will.

In re Michael Lewis's Will.

The will was signed at this time. After the fit, he was incapable of doing anything. It was some questions that were put to him, and he fell off shortly. A considerable time intervened between the signing of the will and his being seized with the fit. It may have been five minutes or more. It may have been at least five minutes, to the best of my opinion."

On his cross-examination the witness further testified: "When I commenced the conversation, I said to him it would be prudent for him to have a will made. The money was not taken out and counted. Only what I mentioned before was taken out. He included the land in the amount of property he was worth. I asked him: 'Didn't you promise that land to Mr. Burnes the evening before?' He said he wanted to sell the farm; that is the answer he made me. He didn't say whether he promised it to Mr. Burnes or not. All he said was, he wanted to sell the land. I next spoke about his making some provision in his will for charitable purposes. He said he would see me again; that he wanted to sell the land, and would see me afterwards. . . . The will was all written prior to the witnesses' coming in. I read the will over to myself first, then I read it for him, and then I called in the witnesses and read it for him and the witnesses. After the witnesses had come in, and I had read it aloud in the presence of the witnesses, the testator signed first, then the witnesses signed. . . . I asked him could he write. He said he could. Then he signed his name. I don't know how he could write before. He had not much effort; had a little effort at the pen. I told him I could write his name, and he could make his mark. He said he could write. He then wrote his name, and then the witnesses signed. The pen was not giving the ink right, and he made some effort that way."

On redirect examination the witness further testified: "Before the witnesses came in, he had given me a brief sketch of his former life, about his living in New York, and how he had deposited his money in a seminary or college, and so on.

He talked right on through. I did not notice any hesitation in his speech. That was shortly after I went in, while he was relating to me the circumstances of his life. The semi-comatose state began setting in during the solicitations after the signing of the will, and not during those that preceded. . . . From my observation of his appearance, and from all the circumstances that transpired at the time I read the will to him, I believe that he fully comprehended it. . . . I remember reading the will over to Lewis alone, and also of reading it to him in the presence of the witnesses, and I recall his appearance at each of those times. I think he comprehended the reading at one time as he did at the other."

The above quotations constitute but a small portion of the testimony of Mr. Butler, but it is believed that they contain the substance of his testimony in respect to the mental condition of Michael Lewis when the instrument in question was executed by him. The fit which prostrated the deceased just after the execution of the will, passed off, and consciousness returned; but he sank rapidly thereafter, and on the morning of the 14th of March he died.

Were the testimony of Mr. Butler undisputed, there could be no doubt that it proves the deceased possessed testamentary capacity when he executed his will. It shows that he comprehended perfectly the extent and condition of his property, his relations to those who might naturally expect to become the objects of his bounty, and the scope and bearing of the provisions of his will; and that he was able to collect and hold these elements in his mind without prompting, to perceive their bearing upon each other, and to form a rational judgment in relation to them. This, we have already seen, is sufficient to establish testamentary capacity. The fact that he became unconscious soon after the execution of the will, is not very significant. It is well understood that epileptic attacks are often — perhaps usually — very sudden, and so a physician testified on the hearing. It is doubtless within the knowledge

In re Michael Lewis's Will.

of almost every person of ordinary intelligence, that the victims of that malady frequently retain their mental faculties fully to the moment of attack, especially in the earlier stages of the malady.

Several witnesses besides Mr. Butler gave testimony bearing upon the mental condition of the deceased. There were Peppard and Burnes, the attesting witnesses to the will, and Mr. and Mrs. Herr. The most of their testimony consists of details of incidents in the history and conduct of the deceased during the last two months of his life, which, it is claimed, show a want of testamentary capacity. For example, they testify that he mistook squirrel tracks for rabbit tracks, when there were no rabbits in the vicinity, and followed the tracks without any reasonable means at command to capture the game. He talked to himself, and was restless when he slept. He believed there was mineral in the earth on his land, because, as he alleged, there were places on it where the compass would not work. He once talked of going to an Indian camp and getting a squaw, but the witness was not sure but he was joking. On the day that the will was executed, he denied recollection that he was negotiating for a sale of his land when seized with the fit the day preceding. However, he admitted to Mrs. Herr, on the morning of March 12th, that he had promised to devise his land to Burnes. These incidents, and others of like character, come far short of proving want of testamentary capacity. They all may have occurred as the witnesses state, and yet the deceased may have fully comprehended what he was doing when he executed his will.

The most important testimony in that direction is that of Peppard and Burnes tending to show that the deceased was in a semi-comatose state when the will was signed; yet they do not materially controvert the testimony of Butler as to specific facts and circumstances. The chief difference is, that those witnesses gave more weight to the appearance of the deceased at that time than did Butler. Peppard and Butler alone of

the witnesses express opinions as to the general mental condition of the deceased. Butler's opinion has already been stated. Peppard says: "It is my opinion, from the way he acted and appeared, that he didn't understand, on account of the way that he looked at the time. *That was my opinion at the time, and all along.* At the time that I first saw him in there, when I went in to sign the will, the way he acted then, he didn't know what was going on." Peppard is evidently a cautious, intelligent man. He refused to attest the will until it was read in his presence. He had some idea of the duty of an attesting witness to a will, and of the solemnity of the act of attestation. It is impossible to believe that he did not know that a man who "didn't know what was going on" could not make a valid will while in that condition, and that it was a gross impropriety for him to attest the will of one whom he knew to be in that condition, and thus give currency and apparent validity to a void instrument.

Moreover, Peppard propounded the will for probate, and in his sworn petition to the county court in that behalf he stated that Michael Lewis died testate, and that he believed the instrument so propounded is the last will and testament of the deceased.

These decisive acts of Peppard, which are entirely at variance with his testimony, and which were performed when he knew the mental condition of the deceased as well as he did afterwards, greatly weaken the force of his testimony. Indeed, we can give but little weight to his opinion that the deceased was in an unconscious state when the instrument was signed. That the deceased was entirely competent to make a testamentary disposition of his property when he gave Mr. Butler directions to draw his will, is established by an overwhelming preponderance of proof. The presumption is, that he continued competent to do so until the will was executed. After careful consideration of all the testimony on the subject, we think the contestant has signally failed to overthrow that pre-

In re Michael Lewis's Will.

sumption. Our conclusion is, that it is established by a clear and satisfactory preponderance of evidence, that when he executed the will the testator was of sound disposing mind and memory.

2. The next question to be determined is, Does the evidence support the finding that the attesting witnesses subscribed their names to the instrument before the testator signed it? The instrument is attested as a will in due and usual form. Such attestation is of itself not only *prima facie* evidence that the instrument was properly executed, but it raises a strong presumption that it was so executed. Had the witnesses deceased before the probate of the instrument, mere proof that the attesting signatures were their handwriting would have established the will. And the rule would be the same although the signatures of the witnesses were not preceded by any attesting clause or certificate. To defeat probate, the strong presumption of regularity thus appearing upon the face of the instru.nent must be overcome by proof. *Remsen v. Brinckerhoff*, 26 Wend., 325; *Ela v. Edwards*, 16 Gray, 91; 1 Greenl. on Ev., § 126; *Burling v. Paterson* 9 Car. & P., 570.

In view of this presumption, and considering also the infirmity of human memory, it seems most reasonable that a will purporting on its face to be legally executed should not be defeated on any doubtful or inconclusive parol proof that it was not legally executed. The opposite rule would greatly imperil the testamentary right; for under such a rule almost any will might be defeated by the dishonesty or imperfect memories of the attesting witnesses. Hence, in the present case, if the fact that the witnesses subscribed the instrument before the testator defeats the probate thereof as the will of the testator, the fact should not be found, against the presumption of regularity, without very clear and convincing proof. It only remains to consider the evidence in the light of this rule.

Three witnesses only testified as to the order in which the respective signatures were affixed to the instrument. These

were Butler, Burnes and Peppard. Mr. Butler twice testified positively that the testator signed first. Later, during the hearing, he said: "I am not positive *now* whether the testator signed before the witnesses or not." He did not further explain, qualify or withdraw his former positive testimony that the testator signed first. Perhaps the fair inference to be drawn from the testimony of Burnes is, that he intended to convey the impression that the attesting witnesses signed before the deceased. But we are unable to find in his testimony any direct statement that they did sign first. Were he charged with perjury in so swearing, we apprehend that it would trouble the prosecutor to show that he gave any such testimony.

Peppard alone swears positively that the witnesses signed first. The same considerations which impelled us to receive his testimony with caution on the question of testamentary capacity, are operative here, where he seeks to destroy the will by impeaching the order and mode of its execution. They are also applicable, in part, to the testimony of Burnes. Considering all of the evidence, and all the reasonable probabilities of the case, we believe, and so hold, that the positive testimony of Mr. Butler that the testator signed first (notwithstanding his subsequent inability to recollect the fact), outweighs the adverse testimony of Burnes (if he gave any) and of Peppard. It follows that the presumption that the will was legally executed is not overcome by the oral evidence. It must be held, therefore, that the will was legally executed.

3. The question whether, if the witnesses signed first, the will is invalid for that reason was argued by the respective counsel with great ability. The conclusion we have reached, that the evidence fails to prove that they did sign before the testator, renders it unnecessary to determine that question. We therefore express no opinion on the subject.

*By the Court.*— The judgment of the circuit court is reversed, and the cause remanded with a direction to that court to affirm the judgment of the county court.