## WILL OF J. B. SMITH.

*March 24 — June 22, 1881.*

WILLS. *(1) Attestation. (2) Unsoundness of mind, and undue influence. (3) Costs.*

1. Under the statute of this state (R. S., sec. 2282), the witnesses to a will need not attest and subscribe it *in the presence of each other*.

2. Upon the evidence in this case (for which see the opinion), this court holds that, although the testator displayed some eccentricity of character, and was a believer in the power of the spirits of deceased persons to communicate with the living, yet he was of sound mind and not laboring under any undue influence when he made the will here in question.

3. The will being sustained by this court, the costs of the contestants in the county and circuit courts must be paid by them, under ch. 227, Laws of 1881; it is within the discretion of those courts to direct the proponent's costs therein to be paid out of the estate; and all the costs in this court are ordered to be paid out of the estate, the contest appearing to have been made in good faith.

APPEAL from the Circuit Court for *Milwaukee* County.

John B. Smith died at the city of Milwaukee in January, 1879, leaving surviving him a widow, *Elizabeth J. Smith,* whom he married in 1871, and four children by a former wife, the youngest of whom was about thirty years of age when John B. Smith died. The mother of these children died in 1868. After the death of Mr. Smith, his widow presented to the county court for probate an instrument in writing purporting to be the last will of her deceased husband. The instrument is as follows:

"I, John B. Smith, of Milwaukee, in the state of Wisconsin, in consideration of the ungrateful usage of my children, which I have received from them, I deem it important, in consequence of the uncertainty of life, and the certainty that my children, if left to dispose of my property, would take every advantage of my wife, to make this my last will and testament, revoking all former wills. I give and bequeath to my wife, *Elizabeth J. Smith,* all the property, both real and

personal, that I may die possessed of, to do with as she may think best, and this will is made without her knowledge, and I hereby appoint said *Elizabeth J. Smith* the executor of this will, and I hereby give directions that she shall not be required to give any bond for the same, so that she shall not be debarred from acting in that capacity on that account.

"Given under my hand at Milwaukee, Wisconsin, this seventeenth day of July, 1871.                    JOHN B. SMITH.

"The above written instrument was subscribed by the said John B. Smith in our presence, and acknowledged by him to each of us, and he at the same time published and declared the above instrument, so subscribed, to be his last will and testament, and we, at the testator's request and in his presence, have signed our names as witnesses hereto, and written opposite our names our respective places of residence.

"BYRON L. CORSS, Lake, Milwaukee Co., Wis.
"JOHN B. BUTTON, Milwaukee, Wis."

The whole instrument, including the certificate of attestation down to the signatures of the witnesses, is in the handwriting of the alleged testator. When he died, the instrument was found in the county court, and the following record of the deposit thereof appears in the register of that court: "Smith, J. B." "Dead." It does not appear when or by whom such deposit was made. The four children of the deceased joined in resisting the probate of the instrument; but the county court made an order admitting it to probate as the last will and testament of John B. Smith. The children appealed to the circuit court from such order, and a hearing of the matter was had in that court. On such hearing the court called a jury, and submitted to them two questions of fact. These questions and the answers thereto returned by the jury are as follows: "*First.* Was John B. Smith, the testator, at the time of the execution of this will, of sound disposing mind and memory? *Answer.* No. *Second.* Was there any undue influence exercised towards or with or upon the mind of John

B. Smith, the testator, to induce him to make his will con-
trary to what he would have done had he been of sound mind
and memory, without undue and improper influences? *An-
swer*. Yes." The testimony relating to the above questions
is sufficiently stated in the opinion.

On the hearing, Byron L. Corss, whose name appears upon
the instrument as the first attesting witness, was produced by
the proponent. His testimony shows that the instrument was
duly executed and attested as the will of John B. Smith, in
the manner and with the formalities required by the statute;
but it was not attested by the other attesting witness, John B.
Button, in his presence. When Corss signed, Button's name
was not on the instrument. It was satisfactorily proved that
Button was dead, and that the signature purporting to be his
was in his handwriting. The court overruled a motion by pro-
ponent for a new trial of the issues submitted to the jury, and
recited in the order the ground upon which the motion was
denied. Such recitals and the order are as follows: "The
court, having considered the arguments of counsel, and upon
the trial of said matter having taken away from the jury and
reserved to the court the decision of the question whether the
execution of said will was in accordance with the statutes of
Wisconsin, the two witnesses thereto not having signed as wit-
nesses in the presence of each other, and being of the opinion,
after deliberation, that said will was defectively executed in
not being signed by the witnesses in the presence of each other,
and having intended to refuse to admit said will to probate, on
the ground of such defective execution, without reviewing the
questions of the sanity of the testator at the date of its exe-
cution or of undue influence in procuring its execution, as
found by the jury, and it being apparently for the interest of
all parties interested that all questions relating to said will
shall be reviewed by the supreme court on one appeal, and said
circuit court of Milwaukee county, for the purpose of having
all questions relating to said will reviewed in one appeal by

the supreme court, having affirmed the verdict of the jury on the questions of the sanity of the testator and undue influence in the execution of said will, and being desirous of having the same passed upon on their merits by the supreme court, it is hereby ordered that the motion of the proponent to set aside the verdict of the jury in this matter, and for a new trial, be and the same hereby is denied, on the ground that the will was not executed according to law, in not having been witnessed by two witnesses in the presence of each other, and that the verdict of the jury be sustained on the questions of undue influence and sanity." Findings of fact and conclusions of law of similar import were made and filed by the court. Judgment was thereupon ordered and entered, reversing the order of the county court admitting the instrument to probate as the last will and testament of John B. Smith, deceased. The proponent appealed from the judgment.

For the appellant there was a brief by *Flanders & Bottum*, and oral argument by *Mr. Flanders*. To the point that, under our statute, it was not necessary that the witnesses should sign in the presence of each other, they cited *Ela v. Edwards*, 16 Gray, 92; *Dewey v. Dewey*, 1 Met., 352; *Chase v. Kittredge*, 11 Allen, 61; *Gaylor's Appeal*, 43 Conn., 82; *Flinn v. Owen*, 58 Ill., 111; *Hoysradt v. Kingman*, 22 N. Y., 372, 375-6; *Willis v. Mott*, 36 id., 486; *Jauncey v. Thorne*, 2 Barb. Ch., 40; *Parramore v. Taylor*, 11 Gratt., 220; *Hoffman v. Hoffman*, 26 Ala., 535; *Woodcock v. McDonald*, 30 id., 411; *Rogers v. Diamond*, 13 Ark., 474; *Cravens v. Faulconer*, 28 Mo., 19; *Jones v. Lake*, 2 Atkyns, 176, note; *White v. British Museum*, 6 Bing., 310; *Wright v. Wright*, 7 id., 457; *Ellis v. Smith*, 1 Ves. Jr., 11; *Cook v. Parsons*, Prec. in Ch., 184; Cruise's Dig., tit. 38, ch. 5, §§ 35, 36; 1 Greenl. on Ev., § 272; Swift's Dig., 163; 3 Burr., 1775. English decisions since 1837, and the Vermont decisions, are under statutes expressly requiring the witnesses to sign in each other's presence. 2 Jarman on Wills, App., 758; Vt. Gen. Stats., 377, § 6.

For the respondents there was a brief by *Howard & Wall*, and oral argument by *Mr. Wall*.

The following opinion was filed April 19, 1881:

LYON, J. The judgment of the circuit court went upon the ground that it is essential to the validity of a will that it be attested and subscribed by two witnesses in the presence of each other, as well as in the presence of the testator. Our statute contains no such provision. It only requires that the will shall be "attested and subscribed in the presence of the testator by two or more competent witnesses." R. S., 650, sec. 2282. So far as we are aware, the cases on this subject arising under statutes similar to ours (many of which are cited in the brief of counsel for the appellant), uniformly hold that the witnesses need not attest and subscribe the will in the presence of each other. To hold otherwise would be to interpolate a provision in the statute which the legislature has not written there, and which cannot properly be implied from anything which is written. It must be held, therefore, that the alleged will is not invalid merely because the witnesses thereto did not attest and subscribe it in the presence of each other.

We are next to determine whether the findings of the jury are supported by the evidence. The testimony is quite voluminous, but it is unecessary to state it at length. A summary of it is sufficient.

It appears that John B. Smith, the alleged testator, was an early settler of Milwaukee. In 1848 he was elected senator for Milwaukee county, and served as such in the legislative sessions of 1849 and 1850. At one time he was quite wealthy, but in 1857 he became interested in the Milwaukee & Horicon Railroad Company, and ultimately lost all his property in that enterprise. At one time he was president of that company. About 1867 he went into bankruptcy. Soon after he engaged in the business of manufacturing machinery, and continued in

that business until he died.    He was also a solicitor of patents.
He accumulated some property after his financial reverse; but
the precise value of the estate which he left does not appear.
It was estimated, on the argument of the cause, at $6,000 by
counsel for the appellant, and the accuracy of the estimate was
not seriously questioned by the opposing counsel.

Several prominent business men of Milwaukee, who were
intimately acquainted with the deceased for a quarter of a cen-
tury and more before his death, were examined and gave tes-
timony concerning his mental character and condition during
the time they knew him.    From their testimony, and from all
the testimony in the case, it satisfactorily appears that the de-
ceased was a gentleman of excellent moral character, and that
his intellectual powers were of a high order.    His mind was
cultivated by reading and study, and his general information
was very extensive and varied.    One witness says, no doubt
truly, that he was a first-class mechanic and scientist; that he
had a good theory of mechanics, and was a well-read man.
He seemed to have some talent for invention, and did . invent
several articles, which he sought to bring into use.    He at-
tempted other inventions and failed.    He possessed great self-
reliance and firmness, and was not easily swerved from a
purpose deliberately formed.    Some of the witnesses say he
was very conceited and self-willed.    Except that he was some-
what more reserved in his demeanor after his reverse of for-
tune than before, no particular change is observed in his
character during the time covered by the testimony, which was
from about 1840 until he died.

In short, the deceased was a person of vigorous intellect and
will, had unbounded faith in the accuracy and soundness of his
own judgment, and was moved to action by an earnest, sanguine
temperament.    In such a man we should naturally expect·
some peculiarities or eccentricities of conduct, but we find
fewer of these disclosed in the evidence than might reasonably
be looked for.    It appears that for a short time — perhaps two

Will of J. B. Smith.

or three months, but during what year is not shown,— he advertised one of his callings by wearing on the front of his hat a small paper on which was printed the words, "Solicitor of Patents." Also, that he was seen at different times on skates in a public street of the city. It seems, however, that he was testing a new kind of skate which he had invented. Thus far we find no evidence that the deceased was not of sound mind when he executed the instrument propounded as his last will and testament. But there was another peculiarity of the deceased, which will now be considered. He was what is commonly called a spiritualist. He had come to believe that, through certain mediums, he could communicate with the spirits of deceased persons. He received, through one of these mediums, what purported to be a message from his deceased wife, advising him to marry the appellant, to whom he was then paying his addresses. He doubtless believed the message was from his deceased wife. He also consulted mediums quite frequently concerning his business and proposed inventions. He once engaged in wheat speculations on advice from such sources. At first he was successful, but later operations were not so successful. It does not appear that he persisted in these speculations very long after fortune turned against him.

During the French and German war he believed reports of the condition of the contest which he received from mediums, although different from the current newspaper reports. But when the evidence of the truth of the newspaper reports became strong, his confidence in the infallibility of the other reports was weakened. He received a communication purporting to be from his deceased wife after his last marriage, and after he had trouble with some of his children, approving of what he had done. This was evidently after he had executed his will. It does not appear whether or not he regarded the communication as genuine, but probably he did so regard it. But the intense faith of the deceased in the accuracy of his own judgment was a counterpoise to his belief in the pos-

sibility of obtaining direct messages from the other world. It led him to admit another element in his belief which would leave him free to follow his own judgment in a given case, no matter how strongly he might be pressed by supposed supernatural advice or entreaty to act against it. So he came to believe, as one witness states it, " that there was more than one kind of spirits — some might try to fool him, and others might not." It is perfectly obvious from the whole testimony that the infallible test which he applied to determine from which of these classes of spirits a given message came, was this: If it accorded with his judgment, it came from the reliable class; if not, then it came from the other class, and was to be disregarded.

The witness from whose testimony the above extract was taken, and who is a gentleman of great intelligence and accurate perception of character, testified further as follows: " Mr. Smith was a man of pronounced views and opinions; very decided. I am not sure that his spiritualistic views were chiefly in the nature of investigation into the subject. I think he was convinced that it was not merely an experimental investigation. He believed, I think, in spiritualism. My impression is, he believed there were different kinds of spirits. He seemed to acknowledge that the spirits might deceive. The impression I formed was, that where the advice he received corresponded with his own views, he followed it; otherwise, not." We do not doubt that this is a perfectly correct view of the belief of the deceased, and indicates just how far he could have been influenced by alleged communications from the other world. He brought them all to the test of his judgment, and acted accordingly. It is difficult to find evidence of insane delusion, or of any peculiar exposure or liability to undue influences, in a faith thus absolutely subordinated to the judgment.

We cannot consider in detail all the threads of evidence which the learned counsel for the respondents have gathered

Will of J. B. Smith.

up and interwoven with great skill and ability, and which they contend demonstrate the correctness of the verdict and judgment. One of the most significant of these (and the only one which will be specially noticed) is the reason the deceased gave in his will for disinheriting his children, when it appeared in proof that his relations with them were entirely friendly at the time the instrument was executed. The reason so given is, the "certainty that my children, if left to dispose of my property, will take every advantage of my wife." It is argued that this imputation against his children could only have been the result of some undue influence over him. The deceased used strong language in the statement of his reasons for making provisions for his wife. Constituted as he was, he could not be expected to use any milder form of expression. It is the positive expression of a positive man. Yet, after all, it is only the expression of his opinion as to what the conduct of his children would be in a certain contingency. That opinion may have been erroneous. The relations of the children and the wife were, however, naturally somewhat antagonistic, and we do not know what indications of hostility on the part of the children towards the wife the deceased may have observed. The evidence discloses many such indications on the part of some of them at a later date. But, whether this clause of the will is or is not unjust to his children, there are more reasonable hypotheses upon which its insertion may be accounted for than that it was prompted by some undue influence brought to bear upon the mind of the testator.

It is stated in the alleged will that it was executed without the knowledge of the appellant, and she testifies that she knew nothing of it until after it was executed. There is no other direct testimony on the subject, and no testimony in the case from which the inference can justly be drawn that the fact is otherwise. Neither is there any direct evidence in the case that the deceased was prompted to execute the instrument by his wife or any other person. The evidence which, it is

claimed, raises the presumption that he was unduly influenced to do so, has already been considered. It satisfactorily appears that the appellant discharged her whole duty to her husband, and was a good and faithful wife. Several years after their marriage he said to one of the witnesses that he enjoyed life very much with his wife — was very happy. It must be conceded that the provision which the deceased made for his wife was very reasonable and proper. When the expenses of this litigation are paid and the estate settled, it is quite apparent that she will not receive under the will a sum more than sufficient for her comfortable maintenance. The children of the deceased were adults, and were doubtless able to maintain themselves. Obviously his first duty was to make provision for his wife. This he did to the extent of his means. The fact that he had nothing left to give his children, raises no presumption, under the circumstances, that he was the victim, or his will the product, of insane delusion or undue influences. At different times intermediate the execution of the will and his death, he expressed satisfaction with the disposition he had made of his property in the event of his decease. He so expressed himself but a few weeks before his death.

The foregoing is believed to be an accurate delineation of the mental character and condition of the deceased when he drew and executed the alleged will, and a sufficiently full summary of the facts and circumstances bearing upon the questions presented by his appeal, so far as the same are disclosed by the evidence. The subjects of testamentary capacity, insane delusion and undue influence have been very fully considered by this court in the cases of *Jackman's Will*, 26 Wis., 104; *Holden v. Meadows*, 31 Wis., 284; *Chafin's Will*, 32 Wis., 557; *Burnham v. Mitchell*, 34 Wis., 117; *Blakeley's Will*, 48 Wis., 294; *Cole's Will*, 49 Wis., 179; *Carroll's Will*, 50 Wis., 437; and *Lewis's Will*, 51 Wis., 101. The reasoning of those cases, and the doctrines which they approve, need not be re-

peated here. Some of them were stronger cases than this against the validity of the wills there contested, and yet the wills were upheld. It is sufficient to say that, applying the principles established by those cases to the facts of this case, the proof is overwhelming that the deceased was of sound mind when he executed the alleged will, and that the instrument is not the result of any undue influence, but expressed his free, deliberate judgment and intentions in respect to the disposition of his estate.

The verdict of the jury (which in such cases is merely advisory) is against the clear preponderance of evidence, and should have been set aside. The case seems to have been very fully tried, and it is not probable that another trial would bring out any new facts which would change the result. We think, therefore, that the ends of justice require that the litigation be now terminated.

*By the Court.*— The judgment of the circuit court is reversed, and the cause will be remanded with directions to that court to affirm the order of the county court admitting to probate as the last will and testament of John B. Smith, deceased, the instrument propounded as such will by the appellant.

There is nothing in the case which impeaches the good faith of the contestants in litigating the validity of their father's will. We therefore follow the usual practice in such cases, and direct the costs in this court to be paid out of the estate' of the deceased. Under the provisions of chapter 227, Laws of 1881, entitled "An act relating to costs in county and circuit courts on the probate of wills," the costs in those courts must be paid by the contestants.

The respondents moved to modify the judgment so as to relieve them from the costs of the circuit and county court. This motion was disposed of by the following opinion, filed June 22, 1881:

Lyon, J. In the opinion heretofore filed in this cause, it is said that, under the provisions of chapter 227, Laws of 1881, the costs in the circuit and county courts must be paid by the unsuccessful contestants of the will of the deceased. The costs there mentioned must be understood to mean the costs of the contestants in those courts. There is nothing in chapter 227 which prevents either court, in its discretion, from adjudging that the costs of the proponent be paid out of the estate of the deceased.

The judgment of this court herein contains no direction to the circuit or county court concerning the proponent's costs, but leaves those courts free to exercise a sound discretion in that behalf. Hence no modification of the judgment is necessary. The motion to modify the same will be denied, without costs.

*By the Court.*— So ordered.