Will of Grant: Williams v. Malm, 149 Wis. 330.

WILL OF GRANT: WILLIAMS and another, Appellants, vs. MALM and another, Respondents.

*April 3—April 23, 1912.*

*Wills: Execution: Evidence: Recitals in attestation clause: Presumptions: Testimony of witnesses long after event.*

1. Recitals in the attestation clause of a will showing due execution thereof are presumed to be true and can only be overcome by clear and satisfactory evidence.
2. The testimony of witnesses as to the details of the attestation of a will more than twenty years before, contradicting their written statement made when they signed the instrument, is *held* in this case less convincing than the written statement itself.
3. A will should not be lightly set aside where there is no question of mental incapacity or undue influence, and where there is no doubt that the testator intended to make and supposed that he had made a valid will.
4. A joint will of husband and wife was signed by the husband, and the wife's signature appeared in the form of her mark. There were three attesting witnesses. The husband devised his property to the wife, the residue, if any, at her death to go to four legatees, three of whom were her relatives. The wife devised to the husband with the remainder over, if any, to the same legatees. The husband died shortly after the will was made and the wife acted as executrix under it, made no changes therein, and died twenty-two years later. One of the attesting witnesses, the scrivener who drew the will, had died; a second, who was eighty years old at the time of the trial, had no recollection of the transaction and at first denied the attestation and asserted that he had never been in the testators' house, but it is conceded that his signature was genuine; the third admitted having signed as a witness, but denied that either the husband or wife or the other witnesses signed in his presence. It is conceded that the will was drawn at the office of the scrivener and, if properly executed at all, was executed at the testators' home. An expert testified that the body of the will, the name of the wife, and that of the deceased witness appeared to have been written with the same pen and the same ink, at the same time and by the same person; also that the "X" mark in connection with the wife's name was made by the scrivener and apparently in a free and easy manner, not indicating that the

motion of the fingers was interfered with while it was being made. On the other hand, there was evidence that the scrivener was a man in good standing, competent and experienced, who understood the requirements of the law and his duty to see that the will was properly executed; and the wife's executor testified that almost immediately after the execution of the will he saw both testators and the three witnesses together in the testators' house. *Held,* contrary to findings by the circuit court, that the will was properly executed by the wife.

APPEAL from a judgment of the circuit court for Kenosha county: E. B. BELDEN, Circuit Judge. *Reversed.*

A certain instrument in writing bearing date August 6, 1887, was prepared by one Benedict, now deceased, as the last will of Charles Grant and Mary C. Grant, to which was subscribed the name of Charles Grant in his own handwriting, and that of Mary C. Grant by mark, said persons being husband and wife, the instrument purporting to be a joint will. Charles Grant died September 27, 1887, and his will was duly proved and admitted to probate by the county court of Kenosha county on November 1, 1887. Mary C. Grant and *Joseph A. Williams,* appointed thereby as executors, qualified and administered the estate of said deceased, and on January 3, 1889, final judgment was entered by said county court assigning the residue of the estate according to the terms of the will. Mary C. Grant died in May, 1909, and said will was thereafter admitted to probate by said county court. An appeal was taken to the circuit court, where the order of the county court was reversed and the will disallowed. From the judgment of the circuit court this appeal is taken.

*Henry J. Hastings,* attorney, and *Peter Fisher,* guardian *ad litem,* for the appellants.

*Robert Verne Baker,* for the respondents.

BARNES, J. The circuit court found that the deceased, Mary C. Grant, did not sign the will in question and did not make the mark standing for her signature, but that the name

was written and the mark was made by the scrivener, Daniel
B. Benedict, who drew the will; that said Benedict did not sign
the will as a witness in the presence of the testatrix nor at her
express direction; that the will was not attested and subscribed
in the presence of the testatrix by two competent witnesses;
and that the instrument was not duly executed as the will of
Mary C. Grant.   If these findings of fact are sustained by the
required degree of proof, the conclusions of law drawn there-
from are correct and the judgment should be affirmed.

The will, though not drawn by a lawyer, is drawn in a law-
yerlike form and in a manner to indicate that Mr. Benedict,
the party who drew it, understood how a valid will should be
drawn and executed.   The evidence shows that he had con-
siderable experience in drafting wills and that he was a man
who stood well in the community, having held some respon-
sible positions.

Charles Grant signed the will himself.   The name of Mary
C. Grant was written by Mr. Benedict.   The signature ap-
pears thus: "Mary $\overset{\text{her}}{\times}$ C. Grant."   The attestation clause re-
cites that Charles Grant and Mary C. Grant "severally signed,
sealed, published, and declared" the instrument as and for
their last will and testament "in presence of us, the subscrib-
ers, who at their request and in their presence and in presence
of each other have subscribed our names as witnesses thereto."
Then follow the signatures of the three witnesses to the will,
Daniel B. Benedict, Henry C. Dodge, and Joshua H. White.

Charles Grant devised all of his property to his wife, and
provided that if any was left at her death the residue was to
go to four designated persons, three of whom were relatives
of his wife and one a girl who had been brought up by the
Grant family, but had not been legally adopted.   In the event
of his wife dying first, the entire estate was devised to these
four persons.   Mrs. Grant devised all of her property to her
husband, with the remainder over, if any, to the residuary

legatees named in the will of her husband.   The will was executed August 6, 1887, and shortly thereafter Charles Grant died and his will was admitted to probate on November 1, 1887, and his property was distributed according to the terms of the will.   Mary C. Grant died in May, 1909, and the aforesaid instrument was admitted to probate as her will.   The circuit court reversed the order of the county court.   Mary C. Grant was named as one of the executors in her husband's will and acted as such and presumably knew of the contents of the will for nearly twenty-two years after her husband's death, and made no change therein.   So it is fair to assume that she was entirely satisfied with the distribution of the property therein provided for.

The witness Benedict was dead when the will of Mrs. Grant was offered for probate.   The witness White was eighty years of age, and it is apparent that he had no recollection of the transaction.   He first said that he never signed the will as a witness, and later that he did not know whether what purported to be his signature was his or not.   It is conceded that the signature was genuine and that he did sign as a witness at some time and place.   He asseverated with a good deal of positiveness that he had never been in Grant's house.

The witness Dodge testified that he was called to Grant's house to witness the will and that he did so, but that neither Grant nor his wife signed the will in his presence, and that Benedict did not sign as a witness while he was there, and that White was not in the house while he remained there.   There was evidence tending to show, and it seems to be conceded, that the scrivener drew the will in his office, while it is admitted that it was executed in Grant's house, if it was ever properly executed.   One Tyrrell, an expert in handwriting, testified that the body of the will, the name of Mary C. Grant, her mark, and the name of Daniel B. Benedict as witness appeared to have been written with the same pen and the same ink and at the same time and by the same person.

On the strength of the evidence of the expert, with such corroboration as it received from the witnesses Dodge and White, the court concluded that the will was not properly executed, and the question for this court to decide is whether the trial court was right in so holding.    The recitals in the attestation clause show due execution of the will, and there is a strong presumption of the truth of these recitals, which must prevail unless overcome by clear and satisfactory evidence. *Adams v. Rodman,* 102 Wis. 456, 460, 78 N. W. 588, 759; *In re Gillmor's Will,* 117 Wis. 302, 303, 94 N. W. 32; *Will of Arneson,* 128 Wis. 112, 116, 107 N. W. 21; *In re Lewis's Will,* 51 Wis. 101, 113, 7 N. W. 829.    The correctness of the trial court's decision must be tested by this rule and not by the one ordinarily applicable to findings of fact.    Wills should not be lightly set aside where there is no question of mental incompetency or undue influence, and where, as here, there is no doubt whatever that Mrs. Grant intended to make and supposed that she had made a valid will.

The testimony of witnesses as to the details of a transaction such as witnessing a document that took place twenty years before, is a very uncertain guide, where it directly contradicts their written statement made when they signed the instrument.    The testimony of White seems to us to be wholly worthless, not because of any sinister motive on his part, but because of the infirmity of age.    We do not think it is any more improbable that he should forget that he was ever in Grant's house than it is that he should forget that he ever saw the will or ever signed it, or that the signature thereto was his own, after it had been shown to him.    The witness Dodge related the transaction as it occurred to him after the lapse of twenty-two years.    There was nothing tragic or dramatic about the occurrence that was calculated to leave a correct and lasting impression on the mind.    The human mind is not so constituted that it can accurately carry details for a long period of years, where they are not of such an unusual character

as to make an extraordinary impression.    The written state-
ment signed by Mr. Dodge close on a quarter of a century be-
fore he gave his testimony as to how the will was executed, is
much more convincing as to what the fact was than his sworn
statement on the trial, when he must have been testifying from
impression rather than from knowledge.

The trial court attached great and we think undue weight
to the testimony of Mr. Tyrrell.    Conceding it to be true, we
fail to see how it proves very much.    It does not prove that
the name of the scrivener and that of Mary C. Grant were af-
fixed to the will at the scrivener's office, unless we assume that
he could not do this work in Grant's house in the same man-
ner as in the office.    The slant of the writing in the signatures
is the same as that in the body of the will.    This result would
be almost sure to follow if the writer assumed the same posi-
tion in both places.    If the chairs in the two places were of
substantially the same height and the tables were likewise, we
would hardly expect to find any variation in the writings that
may have been made only an hour apart.    It is true the ink
used is the same, but admittedly the witness Dodge signed at
the house, and Mr. Tyrrell makes no claim that the ink which
Dodge used is different from that with which the names of
Mrs. Grant and Mr. Benedict were written.    Mr. Tyrrell's
testimony shows, and, we think, correctly, that the "X" mark
in connection with Mrs. Grant's name was made by Mr. Bene-
dict.    It is the common and usual practice for the scrivener
to make the mark, the party merely touching the pen while it
is being made.    It would not be unusual for the scrivener to
bring his pen with him when he went to the Grant home for
the purpose of completing the will.    The one circumstance
testified to by Tyrrell which is entitled to some weight is that
the mark is apparently made in a free and easy manner and
does not indicate that the motion of the fingers was interfered
with while it was being made.    But this is inconclusive.    If
the penholder was touched lightly close to the pen, the touch

might not interfere with the movement of the pen to any appreciable degree.

On the other hand, we have a number of facts which tend to *supplement the recitals in the attestation clause.* The scrivener, Mr. Benedict, was accustomed to drawing wills, and no doubt understood the requirements of the law in reference to the execution of a valid will. He stood well in the community. He was guilty of a grave breach of duty if he did not see to it that the will was properly executed. Mrs. Grant had no individual property, so that no one was attempting to take anything from her. The legatees in the will, with one exception, were her own relatives and not those of her husband, and all might well be objects of her bounty. She acted as executrix of this will, which, if the evidence of the contestants is true, was never properly executed by her husband. She allowed the same to remain in the probate court as her will without change for nearly twenty-two years, and in addition thereto her executor, *J. A. Williams,* testified that he came to the Grant home almost immediately after the will was executed, and that Mr. and Mrs. Grant and the three witnesses who signed the will were all together in the house when he came in. It is true that *Mr. Williams* is to some extent an interested witness, but if he desired to falsify he might just as easily have testified to something more substantial by saying that he was present when the will was executed and that the name of Mary C. Grant was written at the house and that she made her mark and declared the instrument to be her will before the attesting witnesses. It is true that *Williams* may have been mistaken as to these details after the lapse of so long a time. There is the same likelihood of his being mistaken that there is that Dodge was mistaken, with this exception: *Williams'* evidence corroborates the attestation clause signed by the witnesses, while Dodge's evidence contradicts it.

It is difficult to find precedents that are of much value. The question is one of fact, and it does not often happen that the

facts of two cases are so near alike that one furnishes a guide for the decision of the other. The two cases in this court which in similarity of facts approach most closely to the one we are considering are the *Lewis* and *Rodman* will cases hereinbefore referred to. In each of these cases the circuit court held that the will was not legally executed, although the attestation clause if true showed the contrary. In the *Lewis Case* this court reversed the circuit court on evidence which in our judgment tended much more strongly to impeach the will than does the evidence in the present case. In the *Rodman Case* it was held by a divided court that the finding of the circuit judge should not be disturbed. There are some material differences between the evidence in the *Rodman Case* and the case at bar. There both witnesses were positive that they did not sign in presence of the testator. Here only one witness whose testimony is worthy of consideration has so testified, and his evidence is to some extent impeached by that of *Williams*. There are other differences which it is unnecessary to enumerate.

As we read and interpret the evidence, instead of impeaching the attestation clause in a clear and satisfactory manner, it hardly raises a suspicion that the will was not properly executed. To overthrow the will on such unsatisfactory evidence would result in placing every will that had long been executed at the mercy of the uncertain memories of witnesses to remote transactions of which their recollections must be hazy to say the least.

We think the trial court failed to give the recitals in the attestation clause the evidentiary weight to which they were entitled, and that undue effect was given to the evidence of the expert and of the attesting witness Dodge. It follows from what has been said that the judgment is erroneous.

*By the Court.*—The judgment is reversed, and the cause is remanded with directions to affirm the order of the county court admitting the will to probate.