Teller, S.
A petition was filed in this court, on the 14th day of May, 1886, by Mary Keeler, the widow of decedent and sole executrix named, asking that the last will and testament of Morris Keeler, deceased, be proved and recorded and that letters testamentary be granted thereon. By said alleged will the petitioner was namecTas the exclusive legatee and devisee.
The decedent had no children. He died on the 7th day of May, 1886, leaving him surviving two brothers, two sisters and several nephews and nieces, the children of de-ceased brothers and sisters, his heirs-at-law and next of kin. To these a citation was duly issued and upon the *149 return thereof, William Keeler, Israel Keeler, Sally Alley, Lucinda Alley, brothers and sisters of the testator and William E. Keeler and Dwight Dennis, his nephews, appeared and interposed an answer, alleging that the deceased at the time of executing said alleged will was not of testamentary capacity, and that said instrument was not his voluntary act, but its execution was obtained by undue influence on the part of the petitioner. Objections were, also, interposed by the special guardian of Volney Dennis, a minor heir-at-law.
Much time has been occupied in taking testimony, nearly 100 witnesses having been examined at length. The decedent at the time of his death was eighty-two years of age. The instrument propounded as his will bears date of the 8th day of July, 1881. It was drawn by Roland D. Wade, Esq., an attorney-at-law, then residing at Moravia and who. died a short time thereafter.
The subscribing witnesses were first produced and testified that the alleged will was executed in the law office of Wade, on the day of its date, that all the legal formalities were complied with and there were no other persons present • than the testator, Wade, and the witnesses, two in number. One witness came to the office at the request of. Mr. Keeler and the other at the request of Mr. Wade. There was no conversation at the time except that relating to the .execution of the will. One witness had had previously some business transactions with the testator, the other had had no previous interview with him. A short time before the signing of this will, the testator and his attorney, Mr. Wade, made visits to Auburn and called upon three different physicians. The testator was examined by them as to his mental soundness.
Two of the physicians gave him written certificates, which Mr. Keeler afterwards exhibited to a party who was produced as a witness upon the hearing. These certificates were allowed in evidence as a part of the acts and declarations of the decedent. The certificates are to the effect that the testator at the time of this examination appeared to be of sound and disposing mind. No certificate from the third physician was offered in evidence. All three of the physicians were produced as witnesses and answered hypothetical questions based upon evidence given upon the hearing. It was established by proof that the testator, who had resided more than fifty years in the town of Moravia, had, during most of that time, been a good farmer and managed the business connected with a large and productive farm until 1881, except about three years This farm was about three-fourths of a mile from the-village of Moravia, and the decedent was in the habit of visiting the village *150 very frequently. He traded at different stores, bought goods, sold farm produce and stock, collected money and paid bills, and showed such knowledge of business and clearness of memory as to leave the impression among many of those persons with whom he dealt that he was of sound mind. He was a spiritualist. From 1857 his home had been a rendezvous for people interested by belief or curiosity in that subject. Seances were held there as early as 1857. In 1868 his house was re-built and a dark room was fitted off for sittings, which were held daily and often several times a day. For many years spiritual mediums either resided in the house" or in the vicinity, and visitors, including some very distinguished persons, were permitted, through the mediums, to communicate with departed spirits upon paying for admission to this mystic chamber. From 1870 materialization of spirits was claimed to take place. _ That the testator was a firm believer in spiritualism, including visible evidences of the presence of spirits is proven.
Much of. the evidence given to prove the testator to have been of unsound mind, relates to acts and sayings upon this subject, among which the more prominent are the following:. Upon the occasion of the burning of a barn in his neighborhood, he said the barn would not have burned if the spirits had all been there. Fifteen years before his death the pole to his wagon broke and fell down as he was driving into his barn on returning from Cortland. He then said, and repeatedly afterwards remarked, that the pole broke upon the road and the spirits held it up till he reached home. He was surety upon a bail-bond of a person under indictment who ran away about seven years before his death. He said the spirits told him the man had broken bail, and he claimed from a similar source of information to know where the man was. In 1881 or 1882 he talked about putting a telephone from his house to his barn that the spirits might keep him informed of the condition of his stock. He said the spirits shook hands and talked with him, rode with him in his wagon and ate with him at the table.
He was frequently heard talking as if in conversation with spirits; sometimes when sitting near the chimney in his house, he spoke as if talking with some one up the chimney, saying, “Hello; yes, all right.” He claimed the spirits informed him as to what was going on at home when he was absent, and whether his help were industrious or not, and told him about people stealing his money and other property. He spoke with carpenters in relation to the work of building a spiritualist’s temple, and said he expected the spirits to set the stakes for a nice large *151 building, and they were to mark the size on the stakes. He often said he was not going to die; he was just going to leave his old shell and pass over into the spirit world, and was coming back again to work his farm. He had his trees trimmed up high and a large knoll cut partly down, .and when asked the purpose, said the spirits wanted it done; that he was coming back and wanted it for the spirits. To a number of witnesses he stated that he had known the spirits to lift up his house and set it down in its place, to show their power, without ever breaking a stone. He claimed the roof of his house had once been on fire and the spirits came and put it out. He told one witness that within ten years the spirits were coming out in a body and everyone would see them. He was induced to accept spirit prescriptions for his physical ailments, and placed reliance upon a supposed spiritual promise of the restoration of his wife’s sight. With some of the witnesses .his principal discourse was about spirits, and it is shown that upon different occasions, when conversing upon this subject, he was moved to tears. As one witness says, they were tears of joy. In or about the year in which the will was executed, the testator visited a photographer in Moravia and procured some tin-type plates, which he said he wanted to place in the windows of his house to take •spirit pictures. He afterwards claimed he had obtained the pictures, but said he could not move them out of the house, giving this as a reason for not bringing them to ■show the photographer. He told the witness that the spirits of little children used to come and pat him on the head, and that the spirits told him to build an addition to his house, so that two families could live there. He claimed to one witness that the spirits told him, to move his wood-house, had shown him the proper location for it, and given as their reasons for moving it, that it was so near the house that the worms from the wood could get into the house. He also told the same witness that the spirits had told him where to locate his barn.
In the spring of the year in which the will was executed he told a witness that his dead dog had come back and laid his head on his lap and he patted it; and to another witness that the dog barked very naturally and skipped about the floor. He said the spirit of a pet crow had come back and sat on the window sill. He told one person that the spirits had told him that the man who worked his farm had broken his pigs’ backs, and said it was true, and that the man was trying to kill his horse. To some of the witesses he said that spirits were with him all the time; that they told him what was being done in his absence. He claimed the spirits had told him how many cattle and sheep a man *152 had bought whom he sent out to Canada for that purpose-He said to some of the witnesses that he did no business except as the spirits told him, and that he was guided by them, and didn’t care to do anything except as the spirits guided him; that they told him when to put in his crops, and that corn planted July 30 would ripen, etc. He said, he knew there was no judgment against him in a certain action, because the spirits had told him so. He had been defeated in the action, and there was an execution at the-time in the sheriff’s hands. The testator came to Auburn with a lawyer to be convinced of the fact. The testator-had been heard to talk, of taking directions from spirits as much as eight or nine years before his death. It should be stated that while his faith was firm in the authenticity of' spiritual communications and manifestations, he believed that some spirits carried with them into the other world a propensity to deceive, and when a spirit message came tonina which was in conflict with his belief, he explained it by saying there were living spirits there the same as in this world.
Aside from the peculiar things said and done by the testator in regard to spiritualism and spirit manifestations and influence, the ’evidence introduced to throw light upon the condition of his mind is not extensive and not very important except as regards his actions and feelings, towards his brothers and nephews and nieces. It is shown that he was at times forgetful of things he had done, and that he failed to recognize people he had known. That his interest in his farm had diminished, and he had become comparatively careless and slack in its management; that he was at times irritable, and being a man very exacting in his business transactions, he had been overreaching in his bargains and settlements with his tenants and others. Several of the witnesses who were impressed by his peculiar views relating to spiritualism, testify that they discovered nothing else in him that was strange or remarkable.
The contestants gave evidence to show that testator, for a long time prior to his death, had delusions regarding a supposed desire of his brothers to unlawfully obtain his-property, and claim that this will was the outcome of such delusions and perverted judgment.
A witness who worked for the defendant in 1877, 1878: and 1879 testifies that Morris Keeler’s brother, who was. called c- Doc,” cut some hay on the place on shares; that the testator asked the witness to go down and divide the-hay with “Doc.” He said he didn’t have anything to do-with him; that he wouldn’t believe him; that he would take the last cent out of him, and anything he could get- *153 The witness replied, “Why, your own brother wouldn’t cheat you? ” He said, “ yes, right out of my eye teeth.”
John Murphey, who worked for Morris Keeler in 1881, testified that he was drawing manure into the lot. _ Mr. Keeler said it was Mary’s lot (meaning his wife). Witness said he would try and make it look good then. Mr. Keeler then said: “The Keelers are trying to cheat me all the time.” He said the spirits told him so, and he said: “ They are trying to get my property away from me, but they never shall.” A son-in-law of Israel (Doc.) Keeler testifies he overtook Morris Keeler on the street in Moravia, in 1879 or 1880, and asked him how he was getting along. He said he was being robbed. Witness asked who was robbing him. He said everybody, that the sharks were after him.
A witness, who worked the farm on shares in 1868, traded off one of Keeler’s horses by his direction. He was advised by Thompson Keeler, a brother of Morris, to trad© back, as the man he traded with was going to sue him, and he so told Morris, who said: “Thompson is always putting his foot in when he hadn't ought to.” He said they, the Keelers, were all after him; that he got the information from the spirits. He said all his brothers took his property from him; that his spiritual friends had told him about it. The same year, or the year following, he told the witness that he thought some one was trying to kill him:, that he had been warned by the spirits to lookout; that some one had shot at him at a certain place about a quarter of a mile from his house, and claimed he knew who it was;, that the spirits had told him. On one occasion this witness overheard a conversation between Morris Keeler and his wife. She told him she had a communication from one of his friends, and that they had got to take care of that money. There was at the time a considerable sum of money in the house. She said to him: Tour mother is just as eager to-day to take your money as when she was here on earth. He said: “Yes, take that money and put it in the piano and lock it up, and she can’t get it there.” The witness says he heard Mrs. Keeler repeatedly say to her husband that his relatives, his brothers and sisters, would take his last dollar, and he would reply: “I know that, Mary, very well.”
Another witness testifies he was employed by Mr. Keeler in the spring of 1879 to work his farm on shares. Mr. Keeler told him he wanted some one to come there and five with him, that he was getting old. He said he was being robbed and wanted some one to help him watch. H© said they couldn’t anyone take anything from him without he knew who it was. The witness asked him who he *154 thought it was robbing him, and he replied: “My brothers would as soon rob me as anyone.” The witness said he thought that was queer and said he must be mistaken, and Keeler replied he knew it was so, and that the spirits told him, that they told him all things. A short time after that the testator told the witness that some one had shot at him a few nights before, just as he got out of his wagon. The witness asked him if he knew who it was and he said he ■did, but wouldn’t tell who it was. He said they told him. A common expression when referring to the spirits. He said the shot was from a pistol. He did not claim to have ■seen the person. .
• Alfred Alley, a nephew of the testator, testified that ten or twelve years before, and on a number of other occasions, Morris Keeler told him that as he was driving in his barn ■some one. snapped at him, and he took the witness in the barn and showed him the place where he heard the noise. He said he heard a pistol snap, and he left the wagon and ran into the house. He said he knew the man that did it, and told the witness he knew him. When .asked to tell who it was, he said he would tell some time, and that the man lived just above there. He said the spirits told him who it was'.
One Schuyler Hiltz, who worked for him in 1879, says the testator told him that the spirits told him that the Keelers were going to try and rob him of every cent he had. Witness said they had all they wanted, and it did not seem possible they would do such a thing. Keeler replied he knew better, that Mrs. Eaton (a spirit) had never lied to him yet.
Another witness, who worked for the decedent, testified that in 1879 or 1880, he talked with him about his brothers. Mr. Keeler said his brothers would be glad to .get what property, or anything they could, away from him, and he then, in the same connection, said that somebody had even shot at him at the barn, and said he was going to have things fixed so he could have his property go where he wanted it to go. Another witness, who was a domestic in Keeler’s family in the spring of 1881, heard him say that he bad been shot at two or three times in his barn, and only for the spirits he would’nt have got out safely.
Mrs. Brown, a witness called by the proponents, says: Mr. Keeler came with his wife to her house, which was a short distance from his home, in July, 1881, and brought the will and certificates of physicians and wished them to read. Witness’s husband read the papers, and Mr. Keeler put up his hands, and said, “that comes right to the point.” The witness said to him, you don’t think any of your folks would break a will made to your wife, do you, *155 and he said, you don’t know them; they will come in upon her like a pack of hungry hounds.
There is no evidence in the case to show any attempt on the part of any of the relatives of the testator to take his property during his life-time, or to injure him in any manner. No pretense is made by any one, except as stated by the relator, of any shooting at him, and no one is produced or mentioned who is claimed to have heard the snap of any fire arm.
A few business transactions between Morris Keeler and his brothers are testified to, in all of which the utmost fair -dealing and kindness prevailed. The only foundation for any claim of unfriendliness between them is in the proof that the brothers had not brought their wives to Morris Keeler’s house to visit in a number of years. For this an ample reason may have been found in the fact that most of the time his house was the abode of strangers and of such as may not have been congenial to the brothers’ wives. It does appear that Mr. Keeler’s brothers visited him upon occasions when he was ill. By the terms of the testator’s will all of his relatives are disinherited. It appears in proof that prior to his death his wife, who is the sole beneficiary under the will, had secured to herself considerable of his personal property. It is contended by the contestants that the testator, at the time of executing his will, was subject to insane delusions concerning his brothers and relatives and their attitude towards him, and that the will was prompted by these delusions and supposed spiritual communications regarding his duty to protect his wife against the assumed depredations of his brothers. It is conclusively shown that the testator was physically and mentally weak; he was credulous of advice, which he believed came from supernatural sources; he was the victim of hallucinations. The whistling of the wind in the chimney became to his ears the sound of voices. The air was filled with beings perceptible to his touch; spiritual visitors sat at his table, partook of his hospitality, and in turn entertained him socially in various ways. He heard pistol shots which others tried to persuade him were not real, yet he persisted in telling of what he had heard, and even believed he knew that certain persons had attempted to take his life. If the testator, at the time of making his will, was influenced by a belief which had no foundation outside of his imagination, and from which, owing to a diseased or impaired condition of his brain, he was incapable of being dissuaded, he did not have testamentary •capacity.
Says Denio, J., in Seamen's Friend Society v. Hopper, 33 N. Y., 624: “If a person persistently believes supposed *156 facts, which have no real existence except in his perverted imagination, and against all evidence and probability, and conducts himself, however logically, upon the assumption of their existence, he is, so far as they are concerned, under a morbid delusion, and delusion in that sense is insanity. Such a person is essentially mad or insane on those subjects, though on other subjects he may reason, act and speak like a sensible man.”
Charles Hopper, the validity of whose will was under consideration by the court of appeals in this case, died in 1861, leaving a will by which he gave a large portion of his property to certain charitable societies. He left a widow, to whom he gave in addition to her dower in most of his real estate, a house and lot and household furniture. He left no descendants. After 1855 or 1856 and down to the time of his death, he continued to make purchases for family use, and many persons who dealt with him believed him entirely sane. During this period he commenced to have apprehensions that his wife was unfaithful and that his relations, nephews and nieces, were trying to break up his family. He ill-treated his wife, became excitable and believed there was a conspiracy to cause his death. The court was satisfied that there was no- real foundation for the charges made against his wife and relatives, but that the testator believed them and laboring under the delusion was influenced in making his will. The delusions related to the persons, who in the natural course of things, or by law if there had been no will, would have become the recipients of his property. The court of appeals affirmed the decision of the supreme court and decree of the surrogate rejecting the will. It was said by Danforth, J., in Riggs v. American Tract Society (95 N. Y., 512), referring to a party to a contract: “If delusion exists upon one subject he was as to that of unsound mind, although in regard to other subjects he might reason and act like a rational man.”
The following language of Mr. Justice Sergeant, in the opinion of the court in Boyd v. Eby (8 Watts. Pa. Rep., 70), is quoted with approval and emphasis. In Wharton and Stifle’s Medical Jurisprudence, section 35, speaking of a person, the legality of whose acts was under inquiry he says: “If he is under a delusion, though there be but a, partial insanity, yet if it be in relation to the act in question, it is well-settled it will invalidate contracts generally,, and defeat a will which is the direct offspring of the partial insanity.”
“The will of a person affected by insane delusions ought not to be admitted, if he has disinherited his family without cause, or looked on his relations as enemies. In all *157 such cases, where the delusion exercises a fatal influence on the acts of the person affected, the testamentary power fails, the will of the party is no longer under the guidance of reason, it becomes the creature of the insane delusion.” Pidcock v. Potter, 8 Am. Rep., 190, note.
It is essential that a person making a will have capacity to comprehend perfectly the condition of his property, his relations to the persons who were, or would have been the objects of his bounty and the effect of the provisions of the will. A person whose judgment is effected by disease, so that he is compelled to the belief that his friends are his enemies, does not have capacity to comprehend his true relations to the persons who might naturally or by law be the objects of his bounty. The belief of the testator that his brothers and other relatives, the Keelers, as he called them, were trying to rob him even to the extent of committing the gravest crime known to the law was a delusion.
The persistent adherance to this opinion against argument, is, in the circumstances of this case and the mental weakness of testator, convincing evidence that he was insane. And it cannot make any difference whether his motive in keeping his property away from his brothers’ families was to provide for his wife, or to save it for his own use when he should return to the earth, after death, to enjoy it, as some of the evidence indicates he expected-to do.
These inferences regarding the testator’s mental condition, I think are supported by the opinions of the physicians who were examined as experts upon the trial. Dr. Theodore Dimon, a distinguished phyician called by the proponents, has made insanity a special study and been officially occupied in the care of the .insane. In speaking of hallucinations and other perversions of the special senses, he distinguished between the sane and insane and says: “ The former may be convinced that they are wrong, the latter are incapable of being so convinced.”
A hypothetical question was propounded to the witness, based upon the evidence given by the contestants as to the declarations of the testator and the witness testified that taking the statement as true, that the testator believed all the things he claimed to have seen and heard from the spirits and otherwise, without explanation, they indicate insane illusions. Dr. McDonald, the superintendent of the state asylum for insane criminals, and a high authority upon the subject of insanity was called by the contestants, and testified that, in his opinion insane persons were always in a delusional state as indicated by their acts, although they do not always express their delusions, and that in a case of insane delusions the individual refuses to be convinced *158 by ordinary reasoning to the contrary of what he believes. In reply to the ■ hypothetical question embracing substantially a recital of his acts and of the statements made by the decedent to the contestants’ witnesses, he answed "that in his opinion they would indicate that the testator was insane; that he was the victim of delusions and hallucinations.
On the part of the proponents much evidence has been given of business transactions of the testator prior and subsequent to making the will, and much stress is laid upon the fact that many things tike the sale of stock and purchasing of articles at the stores and the payment of bills by him were done with accuracy and in such a manner as to convey the impression that he was sane. In most of. these cases the subject of spiritualism was not broached,and no allusion was made to the feeling entertained by the testator towards his brothers. In nearly every instance in which spiritualism was touched upon, the witness confessed by words or smiles to an impression of Hr. Keeler’s serio-comic peculiarity.
Many authorities are adduced by the proponent’s counsel to sustain the position that a belief in spiritualism, witchcraft, clairvoyance or dreams is not sufficient ground upon which to set aside a will rationally made.
In the case of Brown v. Ward (53 Maryland Reports, 376), an issue was raised as to the testamentary capacity of" a woman, who believed she could communicate with departed spirits, through their agency could heal the sick, foretell future events, know what was going on in her absence. She consulted spirits about matters of business and was directed by them how she should make her will. The judge, in commenting upon the facts of the case, says: “ The delusions which will invalidate a will must point to the actual unsoundness of mind. In other words, it must be an insane delusion.” Again, “he may receive this-(spiritual) advice and act as directed, because he is satified in his own mind and from his own reason that the thing recommended is wise and expedient.” In the case of Smith's Will (52 Wis. Rep., 543) the testator believed in spiritualism. He married a second time, and claimed that the spirit of his first wife approved his choice, and also approved the will he afterwards made in favor of his second wife to the exclusion of his first wife’s children. The court sustained the will, having, from statements of the testator in evidence that the first wife’s spirit did not guide the testator in making the will, but only approved it after it was made, concluded that he was not influenced by his delusions.
The case of the will of Wilber F. Story, of Chicago, *159 decided by the appellate court of Illinois in 1886, affirming-the decision of the circuit court, which sustained the will, presented the question of a belief in spiritualism being an evidence of insanity, The testator was shown to have accepted the supposed advice of spirits in many of his transactions, but he had been extensively engaged in business and had good judgment about most things, and the court evidently believed he was not influenced in making his will by any delusion. While to some minds a belief in spiritualism might seem strange and be an evidence of weak and even morbid intellect, it cannot be held as matter of law or fact to be evidence of insanity. Faith in the undemonstrable is common if not indispensable to the human race. From the earliest period of revealed history the-world, heathen, Jewish and Christian, have believed in spiritual beings, and many wrongs have been committed in. attempts to discriminate against victims of witchcraft and. sorcery. The true inquiry in determining testamentary capacity, as deduced from the best authorities, is whether the will was the result of an insane delusion.
Morris Keeler entertained an insane delusion regarding; the acts and motives of his brothers and sisters and their famihes. His chief thought in making his will was to thwart them in their supposed designs, and in consequence the will was, in a measure, the result of his delusion The cunning he displayed in preparing against the overthrow of his plans is convincing evidence of this fact. While" the-provisions of the will do not, in any manner, suggest-judicial interference, and have caused much hesitation in arriving at this conclusion, I am constrained to the decision, that the instrument propounded is not the will of the testator and probate must be denied.