Estate of Wegner: Wagner, Appellant, vs. Wegner and others, Respondents.

*December 9, 1924—January 13, 1925.*

*Wills: Mental capacity: Duress: Undue influence: What constitutes: Persuasion: Testator's declarations to third persons: Natural disposition of property: Evidence: Sufficiency.*

1. In a contest over the will of a woman aged sixty-eight years, the evidence (set forth at length in the statement of facts) is *held* insufficient to establish undue influence on the part of her daughter, the proponent, who was the sole legatee.   p. 413.
2. The question of competency to make a will is to be determined as of the time of its execution, and while evidence of former mental condition is relevant on the question of competency to make a will, it may relate to time so remote as to have little weight.   p. 414.
3. Where the estate of testatrix consisted only of a mortgage of $3,000, evidence which disclosed that she understood the nature of the business in which she was engaged when the will

was made; that she appreciated the effect of the disposition made of her property, and that she understood what person or persons she desired to participate in her bounty, is *held* to show testamentary capacity.   p. 415.

4. It is not sufficient to constitute undue influence that testator's reason was convinced by persuasion and argument, if the document was executed according to her own will and intention.   p. 416.

5. Declarations of testatrix as to the intended disposition of her property, made to third persons at a time when no improper influence exists, and which were consistent with the disposition actually made, are entitled to weight on the question whether her real intention was overcome or frustrated by undue influence.   p. 417.

6. Before undue influence can be found, it must be of that character which destroys the free agency of testator and substitutes for his intention that of another.   p. 417.

7. One daughter having undertaken the care of her aged mother and none of the other children being in a situation or willing to live with and care for her, a will leaving the entire estate, amounting to $3,000, to such daughter, is *held* a just and natural one under the circumstances.   p. 418.

APPEAL from a final judgment of the county court of Manitowoc county: JOHN CHLOUPEK, Judge. *Reversed.*

This is a contest over the will of Caroline Wegner, by which all of the property was left to her daughter, *Minnie Wagner,* the proponent.   The testatrix was an old lady about sixty-eight years of age at the time of her death, who was partially blind as a result of a cataract on one of her eyes, and whose knowledge of the English language was so scanty that her conversation was generally carried on in the German language.   The testatrix and her husband had lived on a farm in Manitowoc county for a number of years, but in 1909 the farm had been conveyed to a son Charles, and by Charles, in 1915, to a stepson of the testatrix, under the terms of which conveyance the testatrix and her husband were to be paid $200 a year during the remainder of their lives and the life of the survivor, and they were permitted to reside on the farm.   But if at any time the testatrix or her husband should desire to leave the farm, the transferee

was to pay $3,000 to the husband or the testatrix upon de-
mand.    The husband of the testatrix predeceased her by
several years.    The stepson who had bought the farm also
died, and his wife, Mary Wegner, rented the farm to *Ferd-
inand Wegner,* one of the sons of the testatrix, and the three
parties lived upon the farm.    According to the testimony
of *Ferdinand* and the findings of the lower court, Mary
Wegner was forced to move to Minnesota by the nagging
and quarreling of *Minnie Wagner,* who often visited the
farm.    After this *Minnie* and her husband sold their home
in Collins, Wisconsin, and moved upon the farm, for the
purpose of taking care of her mother, according to the testi-
mony of *Minnie,* and at her mother's request, though this
latter assertion is denied by *Ferdinand,* who swore that
*Minnie* requested the change.

While living on the farm with her mother and brother,
*Minnie* did part of the cooking, which *Ferdinand* testified
he had previously done as his mother could not do it, while
her husband worked for a neighboring farmer, and assisted
with the farm work on the home farm in the evening.    *Min-
nie* and her husband did not pay any rent and the expenses
of the mother's wardrobe were borne by *Minnie,* according
to her testimony, though *Ferdinand* swore that her method
of purchase was to charge the items to him and that he
ultimately paid for them.    *Minnie* and her mother quar-
reled considerably according to the testimony of *Ferdinand,*
and these quarrels were often with reference to the prop-
erty of the mother.    The husband of the proponent also
testified that the two women quarreled at this time, but
stated that these quarrels were merely the results of dis-
agreements as to the running of the household and not with
reference to the monetary affairs of the testatrix.

Considerable testimony was given concerning the con-
duct of the mother during this period, which led some of
the witnesses to conclude that she was mentally unsound.
Mary Wilberscheid, who lived across the road from the

Wegner farm and had known the testatrix for thirty-six years, testified that on one occasion during this period while she was present on the Wegner farm she saw the testatrix talking to herself and that she later screamed, and when led to her room denied that it was her room and asked "whose dirty children" were on the bed, the children being the grandchildren of the witness; that on this occasion the testatrix told her that *Minnie* was trying to get her money and was taking all she had, but that *Ferd* was a good boy and that she wanted to stay with him; that she sometimes saw the testatrix poking in trees with a stick or a hoe and sometimes trying to chop them down.    Elizabeth Wilberscheid, the daughter-in-law of Mary Wilberscheid, testified that she too had seen the testatrix poking in trees with a stick and chopping them with an ax; that *Minnie* had told her that she had hidden the ax so that her mother could not get it; that the testatrix had told her that she did not want to go away with *Minnie*.    Ferdinand and his wife, Alvina, *Adolph Wegner*, another son of the testatrix, and his wife, Julia, and *Herman Wegner*, a third son, and his wife, Sophia, all testified that during this period they had heard their mother claim that she saw people in the yard when none were there, and that she claimed to see men riding horseback and to be able to see women and children up in the trees, and that she would attempt to dislodge these people from the trees by poking into the trees with a stick or by cutting them down. *Minnie* denied that such hallucinations existed on the part of her mother, but stated that during the year which she remained on the farm her mother was very ill a large part of the time.    Theodore Wagner, *Minnie's* husband, admitted that the testatrix sometimes saw people out of the windows when there were none out there, though he swore that she never did this after she came to live with them.    Charles and Louise, other children of the testatrix, testified that they had never seen their mother when she had these hallucinations.

There was testimony by some of the contestants' witnesses to the effect that *Minnie* often quarreled with her mother about the $3,000 which she conceived her mother to have, and Elizabeth Wilberscheid and Julia and Sophia Wegner swore that *Minnie* had told them that her mother ought to be moved in order that the children might obtain the $3,000 provided for in the condition of the conveyance of the farm. Elizabeth Wilberscheid further testified that *Minnie* had stated to her that Dr. Norby, who attended the testatrix while she was living on the farm, had said that in the mother's condition that if she had any property to dispose of she ought to make a will at once. Albert Schroeder, a nephew of the testatrix, testified that in the month of August, 1922, he had found the testatrix in a swamp, and that upon asking her what she was doing she told him that she had left the picnic and was going home, and when informed that she was on the wrong road she asked who he was, and when told his name recognized him and said that she had left the picnic because *Minnie* was going to lick her and take all of her money away from her. The other witnesses, including the proponent of the will, verified this testimony so far as the discovery of the testatrix in the swamp was concerned; but *Minnie* said that her mother had simply lost her way in the course of returning home, due to her poor eyesight. The sisters-in-law of *Minnie Wagner* testified that the testatrix, though formerly on good terms with them, suddenly evinced a dislike for them, and that she had told Alvina and Julia during the threshing season of 1922 that *Minnie* had told her (the testatrix) that they were a lazy lot and that she did not want them around the house, and this though Julia had been married to *Adolph Wegner* for eight years and had previously had no trouble with the testatrix.

In October, 1922, it seems that a general family disturbance arose with respect to the payment of the expenses of *Minnie's* family and of the mother, and *Minnie* left the farm

and went to live in Collins and her mother went with her. There is a little testimony to the effect that the mother did not want to live on the farm, but the general view of all seems to be that *Minnie* was the only one who could care for the mother under the circumstances, if she left the farm. On January 2, 1923, according to the testimony of *Minnie* and her husband, the mother decided to have her eyes attended to.. After going to the oculist, the testatrix, *Minnie,* and her husband went to an attorney, A. L. Hougen, in Manitowoc, who advised them as to their rights under the mortgage, and then, according to the testimony of the attorney and of *Minnie* and her husband, the testatrix said she wanted to make a will and assured the attorney that she knew what she wanted done with her property. The will in question was then drawn up, and after reading it to her it was executed, and Hougen and his stenographer signed it as witnesses. *Minnie* and her husband were present in the room during all of this, though according to the testimony of all present neither of them suggested that the will be drawn nor made any statement while it was being drawn and executed. A few months later the testatrix died. The attorney and Mr. Hougen's stenographer and the doctor who attended the testatrix in her last illness stated that she was competent to make a will. The minister who visited her often swore that he had lengthy talks with her and that she talked intelligently and seemed "right-minded." Theresa Krula and Sarah Hovler, neighbors of *Minnie* in Collins, testified that they had heard the testatrix say that she had left all of her property to *Minnie* because *Minnie* was taking care of her. In this the husband of *Minnie* corroborated them, as did also the husband's brother and *Minnie's* brother and sister, Charles Wegner and Louise Behnke. The other brothers and sisters of *Minnie* testified that they had been told not to visit their mother and that as a consequence they did not see their mother until just before she died, and knew nothing of the will until that time or after her death. *Minnie*

asserts that she sent for one of the brothers and that she did not forbid them to come to see the testatrix.

The decision of the county judge was that, although he thought there was enough evidence upon which to decide that the testatrix was not competent to make a will, he based his decision for the contestants on the ground that the will was made while under undue influence and as a result of such influence on the part of the proponent, *Minnie Wagner,* and for this reason refused to allow the will to be probated. Other facts will be stated in the opinion.

For the appellant there was a brief by *Markham & Markham* of Manitowoc, and oral argument by *H. L. Markham.*

*E. L. Kelley* of Manitowoc, for the respondents.

JONES, J.    Since we have come to the conclusion that the judgment of the county court must be reversed, we have given the main features of the testimony at considerable length.    This is especially true as to the evidence offered by the contestants.    We appreciate the weight which should be given to the findings of the trial court and we have given careful consideration to those findings and the rule which prevails in such cases, but we are forced to the conclusion that there was not sufficient evidence to establish undue influence.

As appears from the statement of facts, a large amount of testimony was given for the purpose of proving the incompetence of the testatrix.    Most of this testimony related to events while the testatrix was on the farm, while there were evidently dissensions among the children calculated to create more or less mental anxiety and confusion.    There was practically no such testimony relating to the period after she had removed to her daughter's home.    During the former period she was in poor health and nearly blind.    All who have observed the infirmities of age can well understand that when one is the victim of old age, poor health, and partial blindness, the senses may temporarily fail in their natural

functions. There may be confusion as to names and dates and places. At such times unreal sights and sounds may seem very real and vivid and unreal images are presented to the bodily and mental vision. When health is somewhat restored and these illusions have passed away, the judgment as to the practical affairs of life may be entirely sound.

No thing reveals more strikingly the eccentricities of the human character than a contest over a will. In such contests the peculiarities of the testator during many years are sometimes brought to the public view and often in exaggerated form. Cases which have come before this court in former years well illustrate the kind of testimony relied on in such contests. They contain proof that the testator cherished visionary plans; that he made vain pursuits of wealth or game or mines; that he fancied that he held converse with departed spirits or consulted with and relied on the advice of clairvoyants and fortune tellers or believed in witchcraft; that he was the victim of hysteria or epilepsy; that there was a defective memory as to names and events; that there had been at times abnormal mental elation or depression, unfounded prejudice, and strange suspicion of best friends or false accusations against others; that the testator had held absurd opinions and indulged in wild vagaries or entertained insane delusions. These are a few of the many similar facts which in other cases have been proven to establish lack of testamentary capacity. Not all of these facts, but many of them, will appear in a single case. Such facts as these are relevant not only on this issue but as bearing on the susceptibility of the testator to undue influence.

It is elementary that the question of competency is to be determined as of the time of the execution of the will. While evidence of former mental condition is relevant, it may relate to times so remote as to have little weight. The same is true if the testimony relates to a time when there was ill health from which there had been recovery before the execution of the will. In this case Mrs. Wegner had only one

item of property—her claim to collect $3,000 designated in the mortgage. Although she was advanced in years, uneducated, partially blind, and had been subject to some of the hallucinations which have been described in the statement of facts, it required but little mental effort to comprehend the nature and amount of her property. We are convinced that she understood the nature of the business in which she was engaged when the will was made; that she appreciated the effect of the disposition made of her property; that she well understood what person or persons she desired to participate in her bounty; and that she had testamentary capacity. Although the trial judge expressed the opinion that she was not sufficiently capable to comprehend "her relation of her property to that of her various children," he expressly states that he refrained from finding lack of testamentary capacity. The following are some of the decisions of this court in which testimony, in some respects, similar to that here relied on, was held insufficient to establish lack of testamentary capacity: *Chafin Will Case*, 32 Wis. 557; *Will of Blakely*, 48 Wis. 294, 4 N. W. 337; *Lewis's Will*, 51 Wis. 101, 7 N. W. 829; *Will of Smith*, 52 Wis. 543, 8 N. W. 616, 9 N. W. 665; *Cutler v. Cutler*, 103 Wis. 258, 79 N. W. 240; *Will of Derusseau*, 175 Wis. 140, 184 N. W. 705. In this case there is undoubtedly proof of some of the facts necessary to establish undue influence. Mrs. Wegner had lived for three or four months in the home of *Minnie* when the will was made. During that time the children of the testatrix who appeared as witnesses for the contestant had little intercourse with their mother. If *Minnie* and her husband had the disposition to use undue influence, there was every opportunity. Moreover, a will was executed which was entirely favorable to the proponent, wholly excluding the other children. There is no direct evidence that *Minnie* sought to avail herself of her opportunity by urging her mother to make a will, although there is evidence that while the testatrix was living on the farm

*Minnie* and her husband had said in substance that something should be done so that the $3,000 mortgage should be saved for the children. Although this evidence was relevant to the issue, it may well be doubted whether it was sufficient to establish *Minnie's* disposition to secure the execution of the will in question. Doubtless there may be such convincing proof of coercion as to render direct proof of importunity unnecessary. *Will of Bocker,* 167 Wis. 100, 166 N. W. 660. On the other hand, it is well settled that it is not sufficient to constitute undue influence that the testator's reason is convinced by persuasion and argument, if the document is executed according to his own will and intention. "Importunity, to have legal effect, must be in such a degree as to take away free agency from the testator." *Deck v. Deck,* 106 Wis. 470, 82 N. W. 293; *Will of Carroll,* 50 Wis. 437, 7 N. W. 434; *Mueller v. Pew,* 127 Wis. 288, 106 N. W. 840; *Will of Ball,* 153 Wis. 27, 141 N. W. 8. Although there is sufficient proof to prove two of the required conditions to establish undue influence, we are satisfied that the evidence falls short of proving that when the will was executed the testatrix was susceptible to such influence. She was then in fair health considering her age and partial blindness. She had by no means surrendered hope of life and better eyesight and was anxious to have medical relief for her failing vision. Most of the contestants' evidence concerning the physical and mental conditions of Mrs. Wegner consisted of statements of her relatives, who evidently had a strong bias. Owing to the unfortunate family dissensions, there doubtless was the same bias on the part of the relatives of the proponent who were called to sustain the will. We are convinced that the trial court failed to give sufficient consideration to the testimony of disinterested witnesses. The family physician and the family clergyman made frequent visits to Mrs. Wegner during her residence with *Minnie* and found her intelligent and clear in mind. The same is true according to the testimony

of several disinterested neighbors, who also testified that Mrs. Wegner, both before and after the execution of the will, stated to them that *Minnie* was to have her property because it was *Minnie* with whom she intended to live. If such declarations are made to third persons while no improper influence exists and are consistent with the disposition of the property actually made, they are entitled to weight on the question whether the real intentions of the testatrix have been overcome or frustrated by undue influence. *Will of Emerson,* 183 Wis. 437, 198 N. W. 441. Before such influence can be found, it must be of that character which destroys the free agency of the testator and substitutes for his intention that of another. Another disinterested person who testified was Mr. Hougen, a respectable attorney of twenty-five years' practice, who drew the will and consulted with Mrs. Wegner in her own language. His testimony was unequivocal and to the effect that the testatrix was of a sound and disposing mind and knew what she wanted and gave good reasons for her purpose. We believe that this testimony was entitled to greater weight than was accorded it by the lower court. *Will of Emerson,* 183 Wis. 437, 198 N. W. 441; *Will of Maresh,* 177 Wis. 194, 187 N. W. 1009.

We gather from the evidence that *Minnie* and her husband remained in the room during the conference, but it is undisputed that neither of them participated in the conversation respecting the will. In our opinion it is the better practice, and the one generally followed by attorneys, to conduct such conferences with the testator in the preparation of wills when persons who are deeply interested are not present. Such a practice is more conducive to elicit perfect frankness and freedom in the expression of the testator's real wishes. We are satisfied, however, that in this case the actual and well settled purpose of the testatrix was expressed in her will.

It is claimed by counsel for the respondents that the will is unnatural and not in accordance with natural justice. In

considering this question the relations of the other children to their mother have an important bearing. Among the undisputed facts are these: It was no longer practicable for Mrs. Wegner to remain on the farm with *Ferdinand*. No other child than *Minnie* was in a situation or willing to live with and care for the mother in her old age. *Minnie* was willing to undertake that responsibility. Evidently none of the children then anticipated that the tenure of their mother's life would be so short. It seemed quite possible that she might live for a decade or more. It was natural for her to believe that the execution of this will would be an inducement to *Minnie* to furnish a home and proper care for her during the remaining years of her life. She had the power to change or revoke her will at any time if *Minnie's* care for her proved unsatisfactory. We regard the will as just and natural under all the circumstances and hold that the will should be sustained.

*By the Court.*—Judgment reversed, and cause remanded with directions to admit the will to probate.