WILL OF WINNEMANN: WINNEMANN, Objector, Appellant, vs. WINNEMANN, Respondent.

*April 2—May 1, 1956.*

For the appellant there was a brief by *Fraley N. Weidner* and *Elmer W. Roller,* both of Milwaukee, and oral argument by *Mr. Weidner.*

For the respondent there was a brief by *Dougherty, Arnold & Philipp* of Milwaukee, and oral argument by *Suel O. Arnold.*

BROWN, J.    In her younger days Mrs. Minnie Winnemann was an active, successful, business woman who accumulated property worth some $70,000, consisting principally of an apartment building and various securities.  She had two sons: Clarence, a prosperous business man, and Walter, an unprosperous doctor.  When Mrs. Winnemann grew elderly, in 1942 or somewhat earlier, Clarence took over the management of his mother's business affairs and continued this service until 1949 when he sold out his own Milwaukee interests and moved to Arizona.  After that Walter acted as his mother's business manager.  In 1947 Mrs. Winnemann made a will by which she divided her estate equally between her sons.  On May 3, 1951, Mrs. Winnemann fractured her hip and from then on she was hospitalized, first in Misericordia Hospital and later in a nursing home.  On August 7, 1951, she executed a new will, the one now in controversy. By this she left one third of her estate to Clarence and two thirds to Walter.  She died September 12, 1951, at the age of eighty-three.  Walter offered the will for probate and Clarence objected, asserting (1) it was not executed as required by statute; (2) it was the result of undue influence exerted upon the testatrix by Walter; and (3) Mrs. Winnemann lacked testamentary capacity.

There was a protracted trial, conducted in three main divisions in November and December, 1951, and in June, 1952, with each division consuming several days, and, together, producing a record of a little more than 1,900 pages. The appellant has succeeded in condensing this to an appendix of slightly over 300 pages which the trial court has further reduced to 69 findings of fact. It is the contention of Clarence, objector and appellant, that the evidence is insufficient to support the trial court's conclusion that this is a valid will.

This is obviously a fact case in which the trial court must be sustained unless its findings of fact are against the great weight and clear preponderance of the evidence, *Will of Dobson* (1951), 258 Wis. 587, 590, 46 N. W. (2d) 758, and we must also be mindful that undue influence is a species of fraud and an objector asserting it cannot prevail unless the proof thereof is clear, satisfactory, and convincing. *Will of Faulks* (1945), 246 Wis. 319, 361, 17 N. W. (2d) 423. It is too well settled to require citation of authority that the trier of the fact is the judge of the credibility of witnesses and the weight to be given to their testimony. Appellant, therefore, labors under a heavy burden in being compelled to rely upon testimony which the trial court said in a written decision he did not believe and other testimony to which he conceded little weight when it conflicted with evidence which he deemed more persuasive.

The contention that the execution of the will was defective rests on the testimony of two of the three subscribing witnesses that they did not sign the attestation clause in the presence of the testatrix. If this was all, it would be conclusive. But at the first hearing the attesting witnesses were separated and did not hear each other testify. All three testified that they signed in the presence of the testatrix. At a hearing about six months afterwards two of them testified that after Mrs. Winnemann had signed they went with the lawyer, Mr. Weinberg, the third witness, to another room out of

testatrix's presence, and there executed the attestation clause. Mr. Weinberg disputed this and it is contrary to the recitations of the attestation clause. Mr. Weinberg is an experienced attorney, familiar with the statutory requirements and the necessity of complying with them. The trial court states in its decision that he believed the first version, citing circumstances which made him suspicious of the change of front. With such contradictory evidence the trial court's finding must be sustained.

The objector's charge that the will is the result of undue influence by Walter upon his mother rests chiefly upon the testimony of a Mrs. Brown who was a nurse in the convalescent home where Mrs. Winnemann stayed during the last months of her life. Mrs. Brown testified at length concerning Walter's callous attitude toward his mother's condition, and his greater attention to his own interests. Most damaging to his cause was her testimony that within the week prior to the day on which the will was executed she overheard someone whose voice sounded like Walter's saying over and over to Mrs. Winnemann: "Walter gets two thirds, Clarence gets one third." In his written decision Judge LEDVINA commented extensively upon this testimony and other evidence given by this witness, pointing out improbabilities and inconsistencies, and ended by stating that he did not believe her. He was the judge of her credibility and unless she is credited there is no direct testimony of an effort by Walter to shape the terms of his mother's will.

There seldom is such direct testimony where undue influence is alleged. When undue influence has been established to the satisfaction of the courts it is usually by inferences reasonably drawn from other evidentiary facts. This court, by Mr. Chief Justice ROSENBERRY, stated the governing principles in *Will of Faulks, supra,* at page 361. We have recently repeated them in *Will of Dobson, supra,* at page 589, thus:

" 'The ultimate facts necessary to be proven in order to establish undue influence have been frequently stated. We shall state them briefly without comment or citation of authority as it facilitates the discussion of the issues. (1) A person unquestionably subject to undue influence. (2) Opportunity to exercise such influence and effect the wrongful purpose. (3) A disposition to influence unduly for the purpose of procuring improper favor. (4) A result clearly appearing to be the effect of the supposed influence.' "

Each of the four elements is essential to a determination that a will is the product of undue influence. In the instant case, besides finding that there was in fact no undue influence, the trial court found that the will is a natural will. That is, the will can be attributed to the proper and natural motives of the testatrix uninfluenced by improper persuasion or representations, and therefore does not clearly appear to be the effect of supposed influence.

In 1947 when Mrs. Winnemann executed a will leaving half her estate to each of her sons, Clarence was handling his mother's business affairs, which were varied and burdensome. He sold out his own business in Milwaukee and moved to Arizona in April, 1949. Thereafter, Walter, who is a doctor, not only looked after his mother's business interests but also took care of her physical needs and these, particularly when she was hospitalized in May of 1951 with the broken hip, were extensive. He visited her at the hospital almost every day and his wife called upon her at least weekly. Clarence had been successful in business and, financially, was well off, while Walter had failed to prosper and was in rather straitened circumstances. Under such conditions, without being subjected to undue influence, Mrs. Winnemann might naturally feel a greater obligation toward Walter and a desire to supply his needs which were greater than those of his brother.

Undue influence is a species of fraud and to prevail the objector must establish it by clear, convincing, and satisfac-

tory evidence. *Will of Faulks, supra.* That is lacking here. We must agree with the learned trial court that this result, —the will,—does not clearly appear to be the effect of the supposed influence, and therefore the contention that it was dictated by such influence must fail.

Much of the evidence relied on to prove testamentary capacity or the lack of it bears also on the question of undue influence. We will not repeat it under both subdivisions of the opinion but will proceed now to the objector's contention that Mrs. Winnemann lacked testamentary capacity. It is undisputed that she was old and was an exacting and difficult patient in the nursing home. Many times she did not know where she was and did not recognize acquaintances or even relatives who called on her. She had hallucinations, such as seeing flames when there were none and unreasonably suspecting the presence of burglars. On the other hand, she knew what attorney she wanted to draw her will. She had several short conferences with him about it and instructed him concerning the bequests she wished to make. He was acquainted with her and in the past had done legal work for her. She had changed greatly since he last saw her and to be the more certain of her competency he and Dr. Winnemann arranged for her to be interviewed by Dr. Edward C. Schmidt, a psychiatrist. Dr. Schmidt examined her twice. On his second visit she recognized him and called him by name. She answered his questions directly and sensibly, particularly when the questions dealt with her reasons for changing her will and the disposition she now wished to make of her property. Dr. Schmidt testified:

"I attempted to delve carefully into what she had been thinking about and I asked her whether or not she had called an attorney and she stated, 'Yes,' and I asked her why she had called an attorney and she said that she needed advice, and then I asked her why and she was a little hesitant, and then she said, 'I want to change my will' and then I asked her again why, and then she said to me, 'Walter has taken

care of me and has lived near by and therefore I wish him to benefit.' She said it that time too that, 'Clarence has enough.' I assumed she meant money. 'Clarence has enough, but I don't want any trouble.' She reiterated that twice during the discussion."

The doctor made a written report which he sent to Mr. Weinberg and in it stated his conclusion,—

"Although the patient is suffering from a mild senile psychosis, the delusions and memory defect incident to this, in my opinion, in no manner affect her testamentary capacity, since she is aware of the extent of property and the natural objects of her bounty with no psychotic delusions distorting her feelings toward them."

The objector also produced a psychiatrist as an expert witness. This doctor testified in answer to hypothetical questions, as he had not had the advantage of a personal interview with Mrs. Winnemann. The trial court was certainly privileged to give more weight to the testimony of Dr. Schmidt. Mrs. O'Hara, the operator of the nursing home where Mrs. Winnemann lived at the time she made her will, testified to a rational conversation she had with Mrs. Winnemann in the course of which Mrs. Winnemann discussed her property and her two sons. Mrs. O'Hara said that on this occasion Mrs. Winnemann was sensible. Mr. Weinberg, who discussed with the testatrix her former will and the changes she wished to make, considered her competent to make a will and so certified in the attestation clause and, later, on the witness stand. He was experienced, reputable, and in a position to know the fact.

The appellant calls our attention to the fact that Mrs. Winnemann thought · the value of her estate was about $20,000 when in reality it was worth about $70,000. We cannot regard this discrepancy as particularly significant. She was giving to her sons shares in the estate, not specific be-

quests of dollars. For ten years or more she had not been managing her property; that had been done for her by the two sons. It is not surprising if she was not aware of current market values.

Upon the whole record we cannot hold that the great weight and clear preponderance of the evidence is contrary to the trial court's determination that Mrs. Winnemann had testamentary capacity at the time she executed the will. The trial court did not err in admitting it to probate.

*By the Court.*—Order affirmed.