ESTATE OF FULLER: ARCHER, Plaintiff, vs. HENRY and others, Defendants. [Two appeals.]

*January 9—February 5, 1957.*

For the plaintiff there was a brief by *Ruediger & Joanis* and *Hale, Skemp, Hanson & Schnurrer,* all of La Crosse, and oral argument by *Quincy H. Hale.*

For the defendants there were briefs by *Bosshard & Arneson* and *Johns, Roraff, Pappas & Flaherty,* all of La Crosse, and oral argument by *Daniel T. Flaherty* and *Philip G. Arneson.*

BROWN, J.   We recognize that the findings of the trial court must be affirmed unless contrary to the great weight and clear preponderance of the evidence and undue influence is not to be proved but by clear, convincing, and satisfactory

evidence. *Estate of Miller* (1953), 265 Wis. 420, 425, 61 N. W. (2d) 813, and cases there cited. *Will of Winnemann* (1956), 272 Wis. 643, 645, 76 N. W. (2d) 616. The credibility of witnesses and the weight to be given their testimony are matters for the trial court. *Will of Winnemann, supra.* So are the inferences to be drawn from the evidence.

Many witnesses testified that they considered Miss Fuller incompetent at times when they observed her in the hospital both before and after the execution of the will. The hospital records on the days surrounding July 5, 1955, have frequent entries that Miss Fuller was disturbed or disoriented. But, "it is elementary that the question of competency is to be determined as of the time of the execution of the will." *Estate of Wegner* (1925), 185 Wis. 407, 414, 201 N. W. 826; *Estate of Kesich* (1944), 244 Wis. 374, 383, 12 N. W. (2d) 688. The test of testamentary capacity has frequently been stated and was recently repeated in *Will of Klagstad* (1953), 264 Wis. 269, 271, 58 N. W. (2d) 636:

". . . the general rule recognizing that the test of mental competency is whether the testator had sufficient active memory to comprehend, without prompting, the condition of his property, his relations to those who might be beneficiaries, and to hold these things in mind long enough to perceive their relations to each other and to be able to form some rational judgment in relation to them."

The trial court filed a memorandum opinion quoting this test and analyzing the evidence which led him to the conclusion that at the time Miss Fuller executed her will, July 5, 1955, she had testamentary capacity. Significant extracts from that opinion, which we have checked against the record, are:

"While the testimony of the nurses on duty at other times is not to be disregarded, nevertheless, more weight must necessarily be given to the testimony of those of the pro-

fessional staff of the hospital that were on duty at the time of the execution of the disputed document on July 5th.

"In this regard, the court must therefore consider the testimony of nurse Mrs. Genevieve Wrobel. It was the general conclusion of the court from the testimony of this witness that she considered the deceased at the particular time in question competent. Her testimony was that the deceased was alert at that time. It would seem to the court, although not mentioned in briefs, that one of the important factors was the fact that deceased had just rested prior to the arrival of Judge RUEDIGER and the subscribing witnesses. Shortly after 3 p. m. July 5th, this witness had rolled down the bed of the deceased and she had rested until shortly before the arrival of the subscribing witnesses. This rest undoubtedly contributed to the general mental competency of the deceased at this very important time. She had rested and after resting, was sitting up in bed awaiting the arrival of the necessary people that she might transact her last business. She was so mentally competent at that particular time that she knew Judge RUEDIGER whom she hadn't seen in many years. . . .

"It is true that there were some witnesses who visited the deceased who testified that upon such visit the deceased was incompetent. As a general proposition, however, none of these witnesses were as closely associated with the deceased as the subscribing witnesses and thus were not in a position to as accurately appraise the competency of the testatrix as were the subscribing witnesses. It is further noted that some of these were relatives and their testimony must obviously be considered in light of their interest in the outcome of this contest.

"It is, therefore, incumbent upon the court to give considerable weight to the testimony of the subscribing witnesses in respect to mental competency of the deceased.

"The attorney who prepared the contested Exhibit No. 1 is an able, competent, experienced attorney. His extensive practice in probate court, his drafting and execution of 1,500 to 2,000 wills, places his testimony in a position of being entitled to considerable weight on this question. His testimony was direct and positive to the effect that at the time the deceased executed the will in question, that she was of sound mind and memory. She was of such sound mind that

she even recalled knowing the attorney whom she had not seen in many years. She was also of such sound mind that she was able to supply an apparent omission from the will which the attorney had neglected to read to her. It would seem that with an attorney of such extended experience that had such an attorney entertained any question as to the mental competency of the deceased, that he was in an excellent position to call in a couple or at least one doctor from the hospital staff where the will was executed to examine the testatrix upon the execution of such important document in order to have such evidence available at trial. The opinion of the attorney as to the competency of the testatrix obviously was so positive as to dismiss this procedure from his mind as being unnecessary. The testimony of the other two subscribing witnesses is also entitled to great weight. Both of these witnesses were old friends of the deceased and were frequently with the deceased for a period up to forty-five years. They were in an excellent position to know the deceased both during good health and compare such impressions of the deceased with their impressions of the deceased on her deathbed and at the time of the execution of the contested will. They also had an opportunity, by several visits to the hospital, to become well acquainted with the condition of the deceased at that time. Both of these witnesses testified that the deceased was competent at the time of the execution of this document. It is significant that these two witnesses were not just two people who were called in for the purpose of witnessing a document but were instead two people who probably, more than any other persons in the world with the exception of Leota Archer, and the medical profession, who could appraise the condition of the deceased. Their judgment as to competency was based on the background of close companionship of many years. It is true that an attempt at impeachment of their testimony was made by one of the attorneys for the contestants, and certainly this evidence is entitled to consideration. However, the statements of the attorney were disputed and the court is inclined to accept as the true beliefs of the subscribing witnesses, those statements made by such witnesses in the court while under oath. The long and close association to the deceased of these two subscribing witnesses, their frequent visits to the hospital, and

their lack of interest in the outcome of the lawsuit entitles their testimony to great weight.

"The court in arriving at this opinion cannot discard the fact that just prior to the execution of the document, deceased had rested for a period. That at the time of the execution she recognized the attorney whom she had not seen in years, transacted other business with reference to her property, corrected the attorney while he read the will to her, then when the work was done again laid down in her bed, glad that she had finally taken care of her affairs."

The record convinces us that testamentary capacity was not lacking at the time the will was executed. Certainly the trial court's conclusion of competency is not contrary to the great weight and clear preponderance of the evidence.

The next question is whether the will is the product of undue influence exerted upon Miss Fuller by Miss Archer.

The elements necessary to be proved by clear, satisfactory, and convincing evidence before an affirmative answer can be given to the question are well established and have been repeated by this court as recently as *Will of Winnemann, supra*. They were accurately stated by the trial court in its memorandum opinion as follows:

"1. A person unquestionably subject to undue influence.
"2. A disposition to influence unduly for the purpose of procuring improper favor.
"3. Opportunity to exercise such influence and effect the wrongful purpose.
"4. A result clearly appearing to be the effect of the influence."

1. As to the first element, the undisputed evidence showed that Miss Fuller had been a teacher of Latin, an accomplished scholar, a superintendent in the Aurora school system, and a business woman accustomed to manage her numerous rental properties and capable of doing so. There is no hint that before she went to the hospital she was susceptible to undue influence and after her entry into the hospital the

record does not disclose that her character or disposition changed.

2. Does the evidence prove a disposition on the part of Miss Archer to exert undue influence? Appellants regard with suspicion amounting to conviction the efforts Miss Archer made to validate Miss Fuller's testamentary dispositions, what they describe as Miss Archer's failure to notify them of Miss Fuller's condition, and Miss Archer's effort to keep them away by a "No Visitors" sign on the door of the hospital room. The "dead man's statute," sec. 325.16, prevented Miss Archer from testifying whether or no these activities were at the request of Miss Fuller who, surely, was dependent on others to carry out any wishes she may have had. The trial court could only infer whether Miss Archer's efforts to have a will properly executed were services in Miss Fuller's behalf or were persistent attempts to secure the disposition of property which she had induced Miss Fuller to make. In its memorandum opinion the trial court says:

"Certainly the testimony of witnesses that Leota Archer influenced deceased is a conclusion not well founded but rather a conclusion which is confused with the behavior pattern of a person who is in the presence of his closest friend and tempered with the respect and admiration each had for such friendship. It does not seem probable that a woman of the education and experience of the deceased would not be aware of any undue influence being exercised upon her by her friend after almost twenty-five years of constant association. If such were the case, this friendship would not have continued for such a period.

"The evidence is certainly clear that these two women were in almost constant attendance of each other for more than twenty years. It is difficult for the court to imagine a closer friendship than the one which existed here between these two women. They worked together, they lived together, they shared expenses, they took vacations together, in fact, they were almost constantly in presence of each other. This friendship was so very close and strong that it even spilled

over to the parents of these two women who also shared a close friendship. The friendship of these two women is not something which only developed in recent years but, instead, existed long prior to the time that deceased had acquired the extensive property now contained in her estate.

"The behavior of Leota Archer during the hospitalization of the deceased, in the opinion of the court, is merely a manifestation of her deep love and devotion for her friend. She behaved and acted in a manner indicative of the lives they had spent together. It was Leota Archer who took charge of affairs in the hospital because it was the natural thing for her to do. She was merely fulfilling her role as devoted friend. While most of the relatives (cousins) stated they were on a friendly basis with deceased, the court is of the opinion that none of them enjoyed any degree of as close friendship but merely the acquaintanceship of cousins who have very little in common with deceased other than such relationship. Their association with deceased was very little and almost negligible compared to that of Leota Archer over the past twenty-five years. This lack of close friendship on the part of the relatives and the strong friendship of the deceased and Leota Archer was admitted by several of the objectors.

"Can the actions of Leota Archer then be, under the circumstances, construed to constitute a disposition to influence? The court is of the opinion that the answer to this question is 'No.' "

In our opinion this conclusion is not contrary to the great weight and clear preponderance of the evidence and it must be sustained.

3. Opportunity to influence the testatrix is conceded but in respect to it the trial court says:

"Certainly there was an opportunity to influence deceased. It is to be noted, however, that there was in almost constant attendance, both day and night, a special nurse. The opportunity to influence is thus confined to a few short intervals each day when the special nurses were out of the room. None of these nurses noted any such behavior on the part of Leota Archer."

4. Finally, does the will itself clearly appear to be the result of undue influence? On this subject the trial court well said:

"The result of the disposition of the property certainly does not appear to be the effect of undue influence. The most important person in the life of deceased was Leota Archer. Deceased then gives her property to such person. A contrary disposition would be better evidence of an effect of undue influence. The direct heirs of deceased had all gone before, leaving only collateral heirs. To now give her property to what some contestants even admit to be the person closest to her was only the natural result of almost a lifetime of constant companionship in both work and play."

We must sustain the trial court's conclusion that appellants have failed to prove by clear and convincing and satisfactory evidence that the Fuller will is the product of respondent's undue influence upon the testator.

Therefore the judgment admitting the will to probate must be affirmed.

The trial court denied respondent's motion for permission to tax costs against the sixteen objectors. Sec. 324.11, Stats., gives the court discretion to order costs to be paid out of the estate or by the losing party. While we are sure that the trial court correctly determined the merits of the action, we do not consider the objections to the probate of the will so lacking in merit as to constitute the denial of respondent's motion an abuse of discretion. The order of denial is affirmed.

Respondent's brief exceeds 50 pages and she has moved for permission to tax costs for it in its entirety under sec. 251.264, Stats. Permission is granted.

*By the Court.*—Judgment affirmed. Order denying taxation of costs in trial court against losing parties affirmed. Permission given respondent to tax costs for her entire brief.