ESTATE OF WOELZ: BELLEW, Appellant, v. HOLZKNECHT and others, Respondents.

*February 1—March 8, 1960.*

For the appellant there was a brief by *Bradford & Gabert* of Appleton, and oral argument by *Alfred S. Bradford*.

For the respondents there was a brief by *Smith, Puchner, Tinkham & Smith*, attorneys, and *C. Duane Patterson* of counsel, all of Wausau, and oral argument by *Charles F. Smith, Sr.*

DIETERICH, J.  George W. Woelz died on September 5, 1958, at the age of seventy-eight years, while an inmate at the Alexian Brothers Hospital, a home for aged people located at Oshkosh. He had been a resident of the city of Appleton most of his life. Approximately thirty years ago he and his brothers formed a partnership known as Woelz Brothers dealing in the wholesale of fine-paper products in the nature of writing paper.

Upon the death of his brother, Herbert J. Woelz, on May 3, 1929, and after completion of the administration of his estate, the remaining brothers, Fred W. Woelz and George W. Woelz, and Mae K. Woelz, incorporated the business under the name of Woelz Brothers, Inc. A certificate of incorporation was issued to it January 8, 1930. Under article V of the by-laws of said corporation a limitation was placed on the subsequent sale of the stock certificates by the stockholders, requiring them to offer stock for sale first to the corporation before sale to a stranger. Fred W. Woelz died March 12, 1953, leaving a will dated November 18, 1950. The seventh paragraph of his will read as follows:

"I also request that those receiving bequests of stock Woelz Bros., Inc., let it remain in the firm, as it stood the test for many years; however, if they desire to dispose of same, that it first be offered to my brother George W.

Woelz, or those active in the management of the firm before offering it for sale elsewhere."

The major portion of the estate of George W. Woelz consisted of 293 shares of common stock of Woelz Brothers, Inc., which, together with the five shares owned by his widow, Mae K. Woelz, was the controlling interest of said corporation.

On the day decedent died, September 5, 1958, a petition was filed by George J. Bellew, for the probate of a will dated July 27, 1957, wherein the proponent was named executor in the decedent's last will and testament and on the same day filed a petition for a special administration to collect and preserve the assets of the estate requesting that proponent be named special administrator. The court entered an order fixing time for hearing petition of proof of will for October 14, 1958, and issued letters of special administration on September 6, 1958, upon the filing of the required bond. On the day of hearing, October 14, 1958, objections were filed to the allowance to probate of the will of July 27, 1957, by Lenore Lally, John W. Lally, and Fred Holzknecht, legatees, on the following grounds:

"(1) That said instrument was not duly executed by the said George W. Woelz, deceased, as his last will and testament, in the manner provided by law.

"(2) That at the time of the execution of said instrument, the said George W. Woelz was not of sound mind and had not sufficient mental capacity to make a will.

"(3) That the execution of said instrument was procured by undue influence, fraud, or duress exercised over and upon said George W. Woelz, deceased, by George J. Bellew."

The proponent filed an affidavit in support of an order to show cause, why said objections should not be dismissed for the reason that the widow survived deceased, and was

the sole heir-at-law, and therefore the objectors to said will had no right to enter objection thereto.

At the hearing it was disclosed that there existed four wills of the decedent, namely, a will dated July 27, 1957, signed by decedent alone, a will dated January 5, 1957, signed by decedent alone, a will dated April 10, 1954, signed by Mae K. Woelz and George W. Woelz, as husband and wife, a will dated February 3, 1951, signed by George W. Woelz and Mae K. Woelz, as husband and wife, to be jointly as well as severally their last will and testament.

It was stipulated in court that the matter be adjourned to December 18, 1958, giving opportunity to publish notices as to all the wills involved and that testimony be submitted relating to the four wills for a final determination so as to avoid a multiplicity of trials thereon.

The wills dated February 3, 1951, April 10, 1954, and January 5, 1957, were filed on October 28, 1958. Objections to the will of January 5, 1957, similar to those filed against the will of July 27, 1957, were filed November 25, 1958, by the same objectors.

The proponent, George J. Bellew, under date of December 10, 1958, filed December 17, 1958, objections to allowance of the will dated January 5, 1957, for the reason that said will was duly rescinded and revoked by will dated July 27, 1957. He also filed objections to allowance of the will dated April 10, 1954, on the following grounds:

"2 (a) That said instrument was not duly executed by the said George W. Woelz, also known as Geo. W. Woelz, as his last will and testament in the manner provided by law.

"(b) That the said instrument propounded as the last will and testament of said decedent is invalid and impossible of performance.

"(c) That said instrument was duly rescinded and re-voked by agreement of the said Mae K. Woelz and the decedent, and by the execution by them of separate wills dated January 5, 1957."

Bellew also objected to the allowance of the will dated February 3, 1951, for the same reasons above stated in 2 (a) and (b), with this proviso included:

"(c) That the said instrument was duly rescinded and revoked by agreement of the said Mae K. Woelz and the decedent and the execution by them of a later will dated April 10, 1954, on file herein."

The evidence discloses that George W. Woelz, prior to 1955, was a good, careful businessman who in his prime of life was an excellent and meticulous dresser. Both of the Woelzes were known to drink and sometimes to excess. George W. Woelz gave up drinking in about 1951. He had started in partnership with his two brothers, Herbert and Fred Woelz, in the wholesale of fine papers. They apparently did well so that when Herbert Woelz died in 1929, the decedent and his other brother formed the corporation known as Woelz Brothers, Inc., and wishing to preserve it in the family, proceeded to place the sale of stock under restrictions. When Fred W. Woelz died March 12, 1953, he left a will dated November 18, 1950, containing provisions bearing out this plan. George W. Woelz apparently had the same thought in mind when he and his wife, Mae K. Woelz, executed their joint will dated February 3, 1951. That will was drafted by James R. Joyce, his attorney. After many conferences with George and Mae Woelz, the will was executed in the Joyce home on February 3, 1951. Before it was executed, each received a copy of the will and the will itself was read word for word to its very end. It was then signed by George W. Woelz and Mae K. Woelz as their will in the presence of both

James R. and Margaret Joyce, who testified that the testator and his wife were respectively of sound mind and memory at the time that they executed the will. James R. Joyce was and had been the attorney for the corporation for years. They were good friends socially and met at least once a month.

Subsequent to the execution of the will of February 3, 1951, Fred W. Woelz died (March 12, 1953), and the probate of his will was handled by Attorney James R. Joyce. To avoid certain problems George Woelz, as executor, had experienced in administering the probate of the estate of his brother Fred, he and his wife Mae decided to make certain changes in their will of February 3, 1951. Mr. Joyce testified that he had at least six conferences with decedent and two or three with his wife Mae before drafting the will of April 10, 1954. During the process of making the changes in the will of February 3, 1951, the decedent consulted Orville S. Luckenbach, a Shawano attorney, who was distantly related to deceased. They met in the first week of April, 1954, while eating lunch at the Elks Club at Appleton and discussed the 1951 will paragraph by paragraph and substituted George J. Bellew as a legatee for $250 in place of a deceased legatee named therein. Mae K. Woelz, although her husband had given up drinking, continued to drink in excess, and George Woelz tried to keep it quiet. Mr. Luckenbach testified that during the month of May, 1954, he again came to Appleton and again had lunch with George W. Woelz at the Elks Club and George Woelz showed him his April 10, 1954, will. After lunch they went to the Woelz home to talk to Mae K. Woelz, who was perfectly sober when they arrived, and told her they had discussed the 1954 will. She inquired of Mr. Luckenbach if he thought it was a good will. Mr. Luckenbach in regard to that point testified as follows:

". . . the only thing that George brought out there, and he said, during the lunch I have been going over this will with Orville, and he just wanted Mae's view, if you got any questions that you want to ask him, about. What Mae wanted to know whether or not I thought it was a good will, and I said if it expresses your intentions that's it. So she was satisfied that it expressed her intentions, and so was George, both of them right there were satisfied, and that was it."

Attorney James R. Joyce and his wife, Margaret Joyce, testified that the April 10, 1954, will was typewritten by Margaret Joyce and when completed both Mr. and Mrs. Joyce went to the Woelz home for its execution. Each of the Woelzes was given copies of the proposed will and again Attorney Joyce read the will to them. Having determined that the April 10, 1954, will carried out their intent as to disposition of property, they both signed the will as their joint will in the presence of James R. Joyce and Margaret Joyce, who in turn signed the will in their presence and in the presence of each other. Both witnesses were satisfied that each of the testators was of sound and disposing mind and memory and knew what they were doing. Mae K. Woelz prepared dinner for all of them which they ate after the execution of the will. Up to this point there is no testimony by any of the witnesses produced that either George W. Woelz or Mae K. Woelz was not mentally competent to make a will. As a matter of fact, all the testimony points to the fact that both were extremely competent. It was during the conferences preliminary to the drafting of the April 10, 1954, will that George W. Woelz made known the plans for the perpetuation of Woelz Brothers, Inc., in the distribution of its stock basing the same on the contingency of continued employment.

In May, 1955, Mae K. Woelz showed evidence of heavy drinking. It was shortly after that time that Mae K. Woelz was taken to a private hospital for alcoholics located at Oconomowoc for treatment, which turned out to be futile and she came back home in late 1955 or early 1956, incurable. Sometime later she was confined to another hospital, senile, and under constant supervision and care.

Shortly after the time Mae K. Woelz was taken to the private hospital in Oconomowoc, George W. Woelz began gradually to deteriorate, both physically and mentally. The undisputed testimony of the employees who came in constant contact with him stated that it became quite noticeable and apparent in the latter part of 1955. He was confused, suffered periods of loss of memory, found it difficult to carry on a conversation, lost interest in his business, and began to be more dependent upon his employees for assistance. He was no longer the astute businessman of former years. In 1956, he failed to recognize various friends of long standing, and could not carry on an intelligent conversation. Lenore Lally, sister of George Woelz, noticed this deterioration of the mind and when George J. Bellew came to her house to discuss this matter, it was agreed that something in the nature of a guardianship for both George and Mae Woelz be established to look after both. No effort was made at that time to have a guardian appointed or the establishment of a conservatorship by George J. Bellew who took upon himself to run the affairs of the Woelzes by obtaining power of attorney from George W. Woelz and Mae K. Woelz. By virtue of the power of attorney, he controlled the voting at the annual meeting of Woelz Brothers, Inc., caused himself to be elected to an important office in the corporation, and engineered the destruction of the protective clause in the stock sale which would have insured a close corporation according to the original plan.

The testimony further discloses that by Christmas of 1956, George W. Woelz was not only hopelessly senile, but was mentally ill and suffering from hallucinations, indulging in imagination of President Eisenhower waving to him, visits, and talking to President Eisenhower and Mamie, and Mickey Mantle, imagining that he had visitors when, as a matter of fact, no one was seen to enter or leave his house, showing flowers in the dead of winter to neighbors where there were none, found wandering on the street in his pajamas several doors away from his home trying to find it, charging that others moved his house without telling him where it was moved to.

Dr. William J. Frawley testified on behalf of the objectors that he is sixty-six years of age, practiced medicine in Wisconsin for forty-one years, and a graduate of the Chicago Medical School. He practiced medicine in Appleton and knew George Woelz very well. The doctor is an eye, ear, nose, and throat specialist. He had treated Woelz since 1932 and continued to treat him up to the time of his death. He knew George Woelz well and personally; they played golf together years ago. He saw a great deal of George Woelz because two of his brothers lived right across the street for about thirty years. Woelz used to be at his brother's home a great deal and the doctor would stop to visit the brother and Woelz would be there. The doctor testified that Woelz was neat and dressed well, was proud of his appearance, and until 1956 was able to carry on an intelligent conversation. The doctor further stated that he remembered seeing George Woelz about the 14th or 15th of December, 1956. He testified as follows: "It was cold weather. I was coming home from the hospital, and I go down Seymour street where George lives, and he was down about three houses from his house dressed in pajamas and slippers and bathrobe. I thought he was in

trouble and I stopped and got him in the car, and I said what's the trouble, and he said I can't find my house. And, I put him in my car and took him home—took him in the side door of his house and saw that he got warm and so forth. And, I said well, what happened George, and he said, I don't know, I just got out and they moved the house, and I couldn't find the house. He did not speak coherently. I again saw him around Decoration Day in 1957. I was playing golf over at the Riverview, his yard is next to the golf course. I saw him in his yard and went over to him and I said Hello George, and he said how did you say your name was; George, I said why it's Dr. Frawley, and he said Oh, sure, Doc, I use to come into the drug store. Never had a drug store in Appleton at any time, I was practicing medicine." The doctor further testified that when he saw Mr. Woelz in December, 1956, he was not sound mentally at that time and not capable of comprehending his property holdings and relationship to people. When he saw him in 1957, he felt Woelz was more confused than he was in 1956. In 1957, Woelz did not recognize the doctor, but did in 1956.

On January 5, 1957, when he signed his will, his condition, according to further testimony, became progressively worse to such an extent that he could not even recognize his most-close friends, so that they ceased to even attempt to visit him. There was further testimony of wholly disinterested witnesses of unimpeachable character and standing in the community: William H. Pifer, general manager of H. C. Prange Company, and Nina and Grace Keyes, his next door neighbors, who had known George Woelz for years immediately prior to his death and saw him almost constantly. They stated that he was wholly incompetent and not of sound mind and memory and incapable of making a will on July 27, 1957.

A review of the testimony of the witnesses to the wills of January 5, 1957, and July 27, 1957, discloses that these witnesses had no prior knowledge of decedent's former mental condition or capacity to use as a gauge to determine his mental condition at the time of execution of the wills, and that no attempt was made by them to inquire into the soundness of decedent's mind. Their only function was that of seeing the decedent sign his name and signing their names as witnesses. Their testimony lacks the showing that either the will of January 5, 1957, or of July 27, 1957, was read to the decedent or that he had read and understood the contents of either of the wills before signing.

An examination of the wills of January 5, 1957, and July 27, 1957, clearly indicates that they are not natural wills drawn in conformance to the plans the decedent had for the perpetuation of the Woelz Brothers, Inc., which had been his main concern during the time he was in his right mind and competent. The proponent of the wills of January 5, 1957, and July 27, 1957, produced only two witnesses: Robert F. Ecker and Leonard M. Williams, besides George J. Bellew, who might be classified as a disinterested witness, who were in constant contact with the decedent at about the time of the execution of these two wills. The trial court stated that it had an opportunity to watch these two witnesses while on the stand and stated it was not too greatly impressed by their respective testimony. Mr. Ecker admitted that under the terms of the July 27, 1957, will he would receive 50 shares of Woelz Brothers stock, whereas under the terms of the will of April 10, 1954, because he was no longer in the employ of the corporation, he would receive nothing. He did admit that the decedent was slipping mentally in the later part of 1956, and was becoming very confused and had to be told what to do. Mr. Williams, who did some work and repair at the Woelz home in 1957,

admitted on cross-examination that he never did any work for the decedent prior to 1955. He testified that he remembered seeing George Woelz at a grocery store in the summer of 1957, and claimed to have talked with decedent. This is disputed by Anton J. Gaschler who had taken the decedent there. According to Gaschler's testimony, Mr. Williams had been drinking and when he saw his condition he, Gaschler, turned away, and was asked by George Woelz, "Who is that man?"

The testimony further reveals that George Bellew entered Woelz's safe-deposit box at the First National Bank of Appleton, removed the will of April 10, 1954, which was turned over by Mr. Bellew to Mr. Witmer, his personal attorney, with instructions to make certain changes in the will. The testimony of Lenore Lally showed that Mr. Bellew advised her that the will of April 10, 1954, was a "goofy" will and that some changes would have to be made in it. He was warned by Mr. James Williamson, an attorney of Oshkosh, who was related by marriage to Mrs. Lally that he, Mr. Bellew, had better have testator examined by a physician to determine whether or not he was competent to make a will. The testimony discloses that Woelz's family physician, Walter S. Giffin, was consulted but the results of his study were not revealed to the court. When the will was ready for execution, Mr. George W. Woelz neither read the will nor had it read to him before he signed it before the two witnesses, and neither of them inquired into his competency. Mr. Bellew brought the witnesses and was about the house at the time of its execution. Virtually the same situation existed as to the draft of the will of July 27, 1957, and the execution thereof. An examination of the will of January 5, 1957, and the will of July 27, 1957, as compared to the will of April 10, 1954, discloses the following:

1. Mr. Bellew receives $2,500 instead of $250.

2. Mr. Bellew was nominated sole executor without bond, instead of the widow, and in case of her incapacity to act then, Mr. Holzknecht and James R. Joyce, his attorney as executors.

3. Mr. Bellew was nominated sole trustee instead of Mr. Holzknecht and Appleton State Bank, as trustees.

4. Mr. Bellew was given one fourth of the residue which he was not given under the will of April 10, 1954.

5. Removed the restrictions of certain specific bequests to be effective only if they remained with the company.

6. Frederick A. Holzknecht, nephew and objecting legatee, under the 1954 will was bequeathed 100 shares of Woelz Brothers, Inc., stock. Under the July 27, 1957, will he was reduced to 75 shares. He was removed in the 1957 will as a residuary beneficiary, whereas in the 1954 will he was to receive one fourth of the residue.

7. John W. Lally, nephew and objecting legatee, was bequeathed 100 shares of Woelz Brothers, Inc., stock under the terms of the 1954 will and reduced under the terms of the 1957 will to 75 shares and from a one fourth of the residue to no share in the residue under the 1957 will.

8. The rights and interest of Lenore Lally, sister and objecting legatee of the deceased, were also substantially affected by the terms of the 1957 will.

The major changes in the will of July 27, 1957, from the provisions contained in the will of January 5, 1957, were two: (1) It increased the specific bequest to George Bellew of $2,500 in paragraph (3h) to $10,000, and the fifth paragraph by making his residual bequest a one-half interest instead of one fourth, and (2) making himself the sole executor without bond and sole trustee thereafter as long as the trust is to continue.

Paragraph (3h) in the will of July 27, 1957, reads as follows:

"To George J. Bellew of Appleton, Wisconsin, nephew of my wife, the sum of Ten Thousand Dollars ($10,000), in recognition of many years of faithful services to me and

my wife particularly for having acted as my attorney in fact without compensation, and the many personal favors which have been a source of great pleasure to both of us."

We find no basis for the appellant's contention that the objecting legatees have no right to contest the 1957 will. The record clearly establishes that the legatees and objectors Lenore Lally, sister, John W. Lally, nephew, and Frederick Holzknecht, nephew, would be deprived of a substantial right and interest by the admission to probate of the July 27, 1957, will, and therefore entitled them to contest it.

See 57 Am. Jur., Wills, p. 554, sec. 824; *Will of Hunt* (1904), 122 Wis. 460, 100 N. W. 874; and *Estate of Buffington* (1946), 249 Wis. 172, 23 N. W. (2d) 517.

In 1 Gary, Wisconsin Probate Law (5th ed.), p. 156, sec. 179, it is said:

"Any person having any substantial right or interest of which he would be deprived by establishment of the will may contest it, and all persons interested are parties to the contest if notice is duly given or they appear voluntarily therein. A judgment creditor of an heir of one dying seized of real estate, which, in the absence of a will, would pass to the heir, has sufficient interest to entitle him to contest probate of the will."

The evidence in this case is not only convincing, but clearly and satisfactorily establishes that the decedent at the time of signing of the wills of January 5, 1957, and July 27, 1957, did not have sufficient active memory without prompting to comprehend the condition of his property, his relation to those who might be his beneficiaries, and to hold these things in mind long enough to perceive their relations to each other and to be able to form some rational judgment in relation to them. The judgment is accordingly affirmed. *Estate of Wegner* (1925), 185 Wis. 407, 201 N. W. 826; *Estate of Kesich* (1944), 244 Wis. 374, 12 N. W. (2d)

688; *Will of Klagstad* (1953), 264 Wis. 269, 58 N. W. (2d) 636; *Will of Winnemann* (1956), 272 Wis. 643, 76 N. W. (2d) 616; and *Estate of Fuller* (1957), 275 Wis. 1, 81 N. W. (2d) 64.

*By the Court.*—Judgment affirmed.